ROBERTS v TITAN INSURANCE COMPANY
(ON RECONSIDERATION)

Docket No. 280776. Submitted November 12, 2008, at Grand Rapids.
Decided February 5, 2009, at 9:00 a.m. Leave to appeal sought.

Kyle Roberts, a minor, by his next friend and mother, Lillian Irwin,
brought an action in the Kalamazoo Circuit Court against Titan
Insurance Company, seeking personal protection insurance (PIP)
benefits for injuries he sustained at age 12 in an automobile
accident involving a Ford Explorer owned by Steven Vandenberg,
Roberts and Irwin's landlord and housemate. Roberts had taken
the Explorer without permission for a joyride that ended when he
hit a tree. Vandenberg had let Irwin use the vehicle for all her
needs for more than 30 days before the accident occurred; however,
he retained title to the vehicle and did not intend that Irwin have
permanent use of the vehicle. Before the accident, Irwin obtained
no-fault insurance for her own vehicle, a Jeep, then changed the
policy to instead cover a Ford Escort, without informing Titan that
the Escort was titled in the name of her 19-year-old son, Vernon
Austin, III, or that it was Austin who would be using the Escort.
Titan claimed that Roberts was not entitled to PIP benefits under
MCL 500.3113(a) because he had taken the Explorer "unlawfully"
and also that the insurance policy was void *ab initio* because of
Irwin's misrepresentation that she owned the Escort. The court,
Gary C. Giguere, Jr., J., granted summary disposition for the
defendant, holding that the family member joyriding exception to
the application of MCL 500.3113(a), adopted by the Court of
Appeals in *Butterworth Hosp v Farm Bureau Ins Co*, 225 Mich App
244 (1997), did not apply to this case. Roberts appealed. The Court
of Appeals, WHITBECK and TALBOT, JJ. (HOEKSTRA, P.J., concurring in
the result only), reversed and remanded the case to the circuit
court, stating that were it not compelled by MCR 7.215(J)(1) to
follow *Butterworth*, it would, instead, hold that there is no family
member joyriding exception to MCL 500.3113(a). The Court of
Appeals declared a conflict between this case and *Butterworth*
pursuant to MCR 7.215(J)(2). 281 Mich App 551 (2008). Following
a poll of the judges of the Court of Appeals pursuant to MCR
7.215(J)(3)(a), an order was entered directing that a special
conflict panel would not be convened. 281 Mich App 801 (2008).

The defendant then filed a motion for reconsideration of the December 4, 2008, judgment of the Court of Appeals. The Court of Appeals granted the motion for reconsideration and vacated the opinion issued on December 4, 2008. 282 Mich App 801 (2009).

On reconsideration, the Court of Appeals *held*:

1. MCR 7.215(J)(1) constrains this panel to follow *Butterworth*, which held that MCL 500.3113(a) does not apply to any person who takes a family member's vehicle for joyriding purposes and only operates to exclude coverage if the person had an actual intent to steal the vehicle.

2. There is no reasonable dispute that Vandenberg gave the Explorer to Irwin to use because her vehicle broke down right after she moved into his house and thereafter she had exclusive use of the Explorer. Under the facts of this case, Irwin's use of the Explorer qualifies her as an "owner" of the vehicle under MCL 500.3101(2)(h) because she had possessory use of the vehicle for more than 30 days.

3. There is no evidence that Roberts intended to steal the vehicle. Because he was a member of the owner's family joyriding rather than attempting to steal the vehicle, under the holding of *Butterworth*, Roberts did not "unlawfully" take the vehicle for purposes of the exclusion from coverage in MCL 500.3113(a).

4. Were this panel not compelled to follow *Butterworth*, it would, instead, hold that there is no family member joyriding exception to MCL 500.3113(a). A conflict between this case and *Butterworth* must be declared pursuant to MCR 7.215(J)(2).

5. The provision in the insurance contract excluding coverage for injuries sustained by any person using an automobile taken unlawfully must be construed to not apply to a joyriding family member in order for the provision to be compatible with existing public policy.

6. Although the Titan policy was procured through Irwin's intentional misrepresentation of a material fact in the application, the "innocent third party" doctrine applies here because Roberts was not involved in the misrepresentation. Titan may not deny Roberts coverage on the basis of Irwin's improper actions.

7. There is no requirement that an insured actually own or be the registrant of the vehicle in order to have an insurable interest adequate to support PIP coverage. The fact that Irwin did not have an insurable interest in the Escort does not preclude recovery of PIP benefits.

Reversed and remanded.

HOEKSTRA, P.J., concurred in the result only.

1. INSURANCE — NO-FAULT — WORDS AND PHRASES — OWNERS OF MOTOR VEHICLES.

   There may be more than one "owner" of a vehicle for purposes of applying the no-fault automobile insurance act's definition of "owner" (MCL 500.3101[2][h]).

2. INSURANCE — NO-FAULT — WORDS AND PHRASES — OWNERS OF MOTOR VEHICLES — USE OF A MOTOR VEHICLE.

   The phrase "having the use" of a motor vehicle for purposes of defining "owner" under the no-fault automobile insurance act means using the vehicle in ways that comport with concepts of ownership; the focus is on the nature of the person's right to use the vehicle; ownership follows from proprietary or possessory usage, as opposed to merely incidental usage under the direction or with the permission of another; it is a regular pattern of unsupervised usage (MCL 500.3101[2][h]).

3. INSURANCE — FRAUD — THIRD PARTIES — INNOCENT THIRD PARTIES.

   An intentional misrepresentation by an insured in procuring an insurance policy may bar a claim by the insured who made the misrepresentation, but does not bar the claim of any insured under the policy who is innocent with regard to such misrepresentation.

*Jonathan W. Willoughby, PLC* (by *Jonathan W. Willoughby*), for the plaintiff.

*James, Dark & Brill* (by *John C. Fish*) for the defendant.

ON RECONSIDERATION

Before: HOEKSTRA, P.J., and WHITBECK and TALBOT, JJ.

PER CURIAM. In this first-party no-fault automobile insurance action, plaintiff Kyle Roberts, by his next friend and mother, Lillian Irwin, appealed as of right the trial court's order granting defendant Titan Insurance Company (Titan) summary disposition under MCR 2.116(C)(10). In our opinion issued December 4, 2008, we reversed but stated that, were it not for the

statements in the lead opinion in *Priesman v Meridian Mut Ins Co*[1] that were adopted by this Court in *Butterworth Hosp v Farm Bureau Ins Co*,[2] we would have affirmed. Necessarily, our opinion of December 4, 2008, declared a conflict with *Butterworth*.[3] The judges of this Court were polled pursuant to the court rule and an order was entered on December 18, 2008, directing that a special conflict panel would *not* be convened pursuant to MCR 7.215(J).[4] Appellee's motion for reconsideration of our opinion was filed December 19, 2008. By order of this same date we grant reconsideration and issue this opinion *on reconsideration* in which we have changed only the bolded words in the paragraph on page 356. In all other respects, the opinion is unchanged, the result is unchanged, and any duty under MCR 7.215(J) has been disposed of through the poll that was previously conducted.

## I. BASIC FACTS AND PROCEDURAL HISTORY

In June 2005, Roberts, at age 12, was seriously injured when he crashed a Ford Explorer into a tree. Roberts was intoxicated at the time of the accident. Following the accident, Roberts spent three weeks in the hospital and required follow-up care for months.

Steven Vandenberg, Roberts and Irwin's landlord and housemate, was the title owner of the Explorer that Roberts was driving at the time of the accident. Irwin and Roberts moved into Vandenberg's home on or about May

---

[1] *Priesman v Meridian Mut Ins Co*, 441 Mich 60; 490 NW2d 314 (1992). The lead opinion was signed by three justices; one justice concurred only in the result of the lead opinion; three justices signed a dissenting opinion.

[2] *Butterworth Hosp v Farm Bureau Ins Co*, 225 Mich App 244; 570 NW2d 304 (1997).

[3] MCR 7.215(J)(2).

[4] 281 Mich App 801 (2008).

1, 2005; they were looking for a place to live, and Vandenberg needed someone to take care of his dog when he went out of town. There is no dispute that Roberts was not legally or biologically related to Vandenberg. There is also no dispute that Roberts did not have permission to drive the Explorer on the day of the accident.

During his deposition, Vandenberg explained that when Irwin moved in he noticed that there was water spilling out from underneath Irwin's Jeep. According to Vandenberg, it turned out that the water pump was in need of repair. At that time, Vandenberg had three vehicles: the Explorer, a Ford Expedition, and a Jaguar. Because he drove the Expedition "all the time" and did not need to use the Explorer, he offered to let Irwin use the Explorer. Irwin thanked him, and he gave her the keys to the Explorer.

Vandenberg stated, to the best of his knowledge, that from May 2005 until the accident in June 2005, Irwin used the Explorer for all her daily needs. According to Vandenberg, Irwin did not pay him anything for the use of the Explorer, and they had no arrangement for the sale of the Explorer to Irwin. Vandenberg and Irwin also had no agreement regarding how long Irwin would be allowed to use the Explorer, but Vandenberg did not intend that Irwin have "permanent" use of the vehicle. Vandenberg agreed that, during the times that Irwin was not using it, he probably could have used the Explorer anytime that he wanted, but he explained that he would probably have asked Irwin for permission first "because [he] gave it to her to use." However, he also agreed that Irwin was using the vehicle with his permission and that he could have told her anytime that he did not want her to use the vehicle anymore. Vandenberg admitted that he did not tell his insurance carrier that Irwin was driving the Explorer.

Vandenberg testified that his insurance company "totaled out" the Explorer after the accident, but he was responsible for the $1,000 deductible, which he paid. Irwin agreed to pay back Vandenberg for the deductible, which he told her was only $500, to give her a break after "what she had been through with her son," but she never paid him.

During her deposition, Irwin testified that when Vandenberg gave her the Explorer to use, she felt that she owned it because she drove it all the time, she was the only person who used it, and all her stuff was in it. Irwin explained, "I just took it that it was mine and I could use it. I could go wherever I wanted. If I wanted to go to Georgia, I could go there. I could do anything in the vehicle." Despite her belief that she owned the Explorer, Irwin later admitted that she did not believe that she had the right to sell the vehicle because she knew she was not the title owner. Irwin confirmed that she did not pay Vandenberg for her use of the Explorer, nor was there any agreement that she pay him for her use. Irwin also admitted that Vandenberg never told her that she owned the Explorer. But, despite confirming that the Explorer was titled in Vandenberg's name and that he paid the insurance for it, Irwin stated that she did not believe Vandenberg had the right to tell her she could no longer use the vehicle because he "gave it to" her. Irwin stated that she paid all the general maintenance costs for the Explorer, including gas, oil, transmission fluid, and windshield washer fluid. Irwin also stated that if the Explorer had broken down, she would have paid for the repairs.

On further questioning, Irwin admitted that she lied to a Titan agent who interviewed her after the accident. When the agent asked her who had use of the Explorer before the accident, Irwin told him that Vandenberg

had sole use of the vehicle. Indeed, she specifically denied ever driving the Explorer. Irwin explained that she lied because she did not want Vandenberg to "get in any trouble." However, she could not specify what kind of trouble she was worried about. Irwin confirmed that she agreed to pay Vandenberg $500 for the deductible, and although she planned to do so, she had not yet paid him. Irwin confirmed that she also lied to the Titan agent when she told him that she had already paid Vandenberg $500 for the deductible.

Roberts testified that when he took the Explorer on the night of the accident, he believed that it belonged to Irwin because "[s]he was always driving it around, had everything in it." Roberts stated that he had never driven any vehicle before, and he admitted that neither Irwin nor Vandenberg gave him permission to drive the Explorer on the night in question. Roberts also admitted that, after Irwin and Vandenberg had gone to bed on the night of the accident, he drank some tequila that he found in the kitchen cupboard. Roberts explained that after drinking the tequila he sat down to watch television and then noticed the car keys in the mesh pocket of Irwin's backpack, which was on the kitchen counter. Roberts could not explain exactly why he took the car. He stated that he just felt like going for a drive. Roberts stated that the next thing he remembered after pulling out of the driveway was waking up in the hospital.

Vandenberg testified that he did not know how Roberts obtained the keys to the Explorer on the night of the accident. Vandenberg stated that he had a spare set of keys for the Explorer that he kept "locked up" and that he did not know where Irwin kept the set of keys that he had given to her. Vandenberg also denied knowing where Roberts obtained the alcohol that he consumed that night, but he admitted that he noticed that some alcohol was missing from his home after the accident.

Although she stated that she often let Roberts start up the Explorer in the mornings, Irwin confirmed that she did not give Roberts permission to drive the Explorer on the night of the accident or at any other time before the accident. Irwin stated that she did not know that Roberts had taken the Explorer on the night of the accident until the police came to the house in the morning. Irwin stated that she normally kept her car keys in her backpack, her purse, or on a set of hooks near the back door. However, she did not know where she put the keys on the night of the accident.

At the time of the accident, Irwin was covered by a no-fault automobile insurance policy that Titan issued to her in March 2005. Irwin had initially purchased the policy to cover a Jeep Grand Cherokee, but in April 2005, she changed the policy to instead cover a Ford Escort. When she applied for the Escort coverage, Irwin provided Titan with a copy of the previous owner's title without any of the buyer information filled in. During her deposition, Irwin first claimed that the title to the Escort was in her name. However, Irwin later revealed that she did not own it and had never even driven the Escort at the time she sought the insurance coverage. Irwin also confirmed that the Escort was never stored at her house. Irwin explained that the Escort was for her son, Vernon Austin, III. Irwin admitted during her deposition that she did not tell the Titan agent that she would not be using the Escort, or that Austin would be using it. However, she clarified that the agent did not ask her who would be using the car. A title search later revealed that the Escort was in fact titled in Austin's name. Irwin stated that she insured the Escort in her name because Austin needed insurance and he was not responsible enough to obtain it for himself.

Citing MCL 500.3113(a), Titan denied Roberts personal protection insurance (PIP) benefits on the ground

that Roberts had unlawfully taken the Explorer. And in June 2006, Roberts filed a complaint, alleging that Titan breached the insurance policy by denying Roberts recovery. Titan then moved for summary disposition under MCR 2.116(C)(10), arguing that Roberts's claim was barred because (1) Roberts unlawfully took the Explorer and (2) the insurance policy issued by Titan was void *ab initio* because of Irwin's misrepresentation that she owned the Escort. Roberts responded, arguing that the trial court should (1) deny Titan's motion for summary disposition because there were genuine issues of material fact regarding whether Roberts "unlawfully" took the Explorer in light of the family member joyriding exception to MCL 500.3113(a) and (2) grant partial summary disposition in his favor instead with regard to Titan's misrepresentation defense because there was no genuine issue of material fact that Roberts was an innocent third party to Irwin's alleged misrepresentation.

After hearing oral arguments on the motion, the trial court issued its written opinion and order in which it concluded that, as a matter of law, the family member joyriding exception to MCL 500.3113(a) was not binding in this case and that, therefore, the statute barred Roberts's recovery. The trial court's full analysis consisted of the following paragraph:

Without question [Roberts] unlawfully took the Explorer. [Roberts] did not have a reasonable belief that he was entitled to take and use the vehicle. The family joyriding exception to MCL 500.3113(a) as stated by the *Priesman* court is not binding on this court or case. Recovery is barred pursuant to MCL 500.3113(a) and the language contained in [Titan's] policy. As such, it is not necessary for this court to address [Titan's] misrepresentation argument, whether Irwin qualified as an owner, whether Irwin had an insurable interest, whether the innocent third party doctrine applies, or whether [Titan's] policy bars recovery.

Accordingly, the trial court granted Titan's motion for summary disposition and denied Roberts's motion for partial summary disposition. Roberts now appeals.

## II. SUMMARY DISPOSITION

### A. STANDARD OF REVIEW

Under MCR 2.116(C)(10), a party may move for dismissal of a claim on the ground that there is no genuine issue with respect to any material fact and the moving party is, therefore, entitled to judgment as a matter of law. The moving party must specifically identify the undisputed factual issues and support its position with documentary evidence.[5] The trial court must consider all the documentary evidence in the light most favorable to the nonmoving party.[6] We review de novo the trial court's ruling on a motion for summary disposition.[7] Construction of unambiguous contract language and interpretation of statutes are questions of law that this Court also reviews de novo.[8]

### B. *PRIESMAN* AND MCL 500.3113(a)

#### 1. MCL 500.3113

Section 3113 of the no-fault insurance act[9] provides, in pertinent part, as follows:

---

[5] MCR 2.116(G)(3)(b); *Maiden v Rozwood*, 461 Mich 109, 120; 597 NW2d 817 (1999).

[6] MCR 2.116(G)(4); *Maiden, supra* at 120.

[7] *Tillman v Great Lakes Truck Ctr, Inc*, 277 Mich App 47, 48; 742 NW2d 622 (2007).

[8] *Archambo v Lawyers Title Ins Corp*, 466 Mich 402, 408; 646 NW2d 170 (2002); *Putkamer v Transamerica Ins Corp of America*, 454 Mich 626, 631; 563 NW2d 683 (1997); *Hafner v Detroit Automobile Inter-Ins Exch*, 176 Mich App 151, 156; 438 NW2d 891 (1989).

[9] MCL 500.3101 *et seq.*

A person is not entitled to be paid personal protection insurance benefits for accidental bodily injury if at the time of the accident any of the following circumstances existed:

(a) The person was using a motor vehicle or motorcycle which he or she had taken unlawfully, unless the person reasonably believed that he or she was entitled to take and use the vehicle.[10]

Thus, under the plain language of the statute, if a person is injured while using a vehicle that he or she took unlawfully, that person is not entitled to PIP benefits. And, under the plain language of the statute, the only exception to this exclusion is where the person had a reasonable belief that he or she was entitled to take and use the vehicle.

### 2. PRIESMAN

In *Priesman v Meridian Mut Ins Co*,[11] the Michigan Supreme Court considered whether "an underage, unlicensed driver injured while driving his mother's automobile without her knowledge or consent may recover medical benefits from the no-fault insurer of her automobile." Similar to the facts in the present case, in *Priesman* a 14-year-old boy sustained serious bodily injuries from an automobile accident after he took his mother's car without her permission during the night while she was asleep.[12] Citing MCL 500.3113(a), the insurer argued that the boy was not entitled to no-fault medical benefits because he was using his mother's car unlawfully at the time of the accident.[13] The insurer contended that the boy's use of the vehicle was "un-

---

[10] MCL 500.3113(a).

[11] *Priesman, supra* at 61 (opinion by LEVIN, J.).

[12] *Id.* at 62.

[13] *Id.* at 62-63.

lawful" because, under Michigan law, it is a misdemeanor to take or use a vehicle "without authority."[14]

After recognizing that the no-fault act does not define the term "taken unlawfully," three members of the Court stated in the lead opinion that MCL 500.3113(a) did not apply to "joyriding" family members, who most commonly were teenagers driving their parents' cars without permission.[15] In so stating they first noted that the Uniform Motor Vehicle Accident Reparations Act (UMVARA), which was a model for Michigan's no-fault act, excluded from coverage persons injured while driving a stolen vehicle, *unless* that person was covered under an insurance contract issued to that person, his or her spouse, or a relative living in the same household.[16] Also acknowledging this provision, the insurer argued that by substituting "taken unlawfully" for "converts" the Michigan Legislature intended to exclude not only thieves who intend to steal the vehicles, but also joyriders.[17] The lead opinion rejected this argument, stating that the Legislature's modification of the UMVARA model merely showed its intent to deny coverage to any thief regardless of his or her insurance coverage, "not necessarily to except joyriders from coverage."[18] In other words, they wrote, "the Legislature did not intend any substantial difference in scope or meaning from the prototypical UMVARA concept excepting

---

[14] *Id.* at 63, citing MCL 750.414.

[15] *Id.* at 63, 68.

[16] *Id.* at 66, citing § 21 of the UMVARA, 14 ULA 87-88 ("[A] person who converts a motor vehicle is disqualified from basic or added reparation benefits, including benefits otherwise due him as a survivor, from any source *other than an insurance contract under which the converter is a basic or added reparation insured . . . .*" [Emphasis added.]), and § 1(i) and (ii) of the UMVARA, 14 ULA 42.

[17] *Priesman*, *supra* at 67 (opinion by LEVIN, J.).

[18] *Id.*

thieves from no-fault coverage . . . ."[19] They reasoned that the Legislature's intent could not have been to deny coverage to joyriding family members, noting that teen joyriding was a common occurrence: "Legislators generally are also parents and sometimes grandparents. Some may have had experience with children, grandchildren, nephews, nieces, and children of friends who have used a family vehicle without permission. Some may have themselves driven a family vehicle without permission."[20] Accordingly, the lead opinion favored a judicially created family member joyriding exception to MCL 500.3113(a).

Despite the fact that a majority of the *Priesman* Court did not agree on the existence of this joyriding exception, Roberts argues that the trial court erred by ruling as a matter of law that the exception was not binding in this case. Roberts acknowledges that *Priesman* itself is not precedentially binding.[21] However, Roberts argues that the rationale of the lead opinion in *Priesman* is binding because it has been adopted in subsequent decisions of this Court.

In *Butterworth Hosp v Farm Bureau Ins Co*,[22] this Court recognized that *Priesman* was not binding precedent and even commented that "any joyriding exception seems to be in derogation of the clear language of the statutes." Nonetheless, this Court felt "compelled" to follow the reasoning of the lead opinion in *Priesman* and extended the exception to adult family members from another household who take a relative's vehicle joyriding.[23] In doing so, this Court clarified that MCL

---

[19] *Id.* at 67-68.

[20] *Id.* at 68.

[21] See *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 58; 664 NW2d 776 (2003).

[22] *Butterworth Hosp, supra* at 248, 249 n 2.

[23] *Id.* at 248-249.

500.3113(a) did not apply to any person who takes a family member's vehicle for joyriding purposes; rather, the statute only operated to exclude a person from coverage if he or she had an actual intent to steal the vehicle.[24]

In *Mester v State Farm Mut Ins Co*,[25] three girls were skipping school together and took a stranger's truck that they eventually crashed during a police chase. The plaintiff argued that the joyriding exception should be extended to anyone who merely joyrides without intent to steal.[26] This Court rejected the plaintiff's argument, noting that, by statute,[27] "[a]n unlawful taking does not require an intent to permanently deprive the owner of the vehicle," and reasoning that "[h]ad the Legislature intended to exempt from subsection 3113(a) all joyriding incidents, it would have chosen a different term than 'unlawful taking,' such as 'steal' or 'permanently deprive.'"[28] This Court then explained that the lead opinion in *Priesman* "recognized a joyriding exception . . . not because joyriding does not involve an unlawful taking, but only because of special considerations attendant to the joyriding use of a family vehicle by a family member."[29] This Court then concluded that those "special considerations" did not "warrant expansion of the exception beyond the family context."[30]

---

[24] *Id.* 249-250.

[25] *Mester v State Farm Mut Ins Co*, 235 Mich App 84, 85-86; 596 NW2d 205 (1999).

[26] *Id.* at 88.

[27] Citing MCL 750.413.

[28] *Mester, supra* at 88.

[29] *Id.*

[30] *Id.*; see also *Allen v State Farm Mut Automobile Ins Co*, 268 Mich App 342, 346; 708 NW2d 131 (2005) (declining to extend exception to nonfamily members who reside in the same household as the vehicle owner).

As Roberts concedes and this Court has repeatedly acknowledged, the lead opinion in *Priesman* is not binding precedent because it was adopted by only three of the seven justices.[31] Further, in urging us to disregard the *Priesman* decision, Titan points out that in recent years the Michigan Supreme Court has more strictly enforced the dictate that "[s]tatutory—or contractual—language must be enforced according to its plain meaning, and cannot be judicially revised or amended to harmonize with the prevailing policy whims of members of this Court."[32] Accordingly, the Court has stated that "[a]lthough stare decisis is generally ' "the preferred course," ' [the Court] will nevertheless depart from erroneous precedent 'when governing decisions are unworkable or are badly reasoned.' "[33] Titan therefore contends that the current membership of the Supreme Court would likely conclude that the justices signing the lead opinion in *Priesman* improperly sought to legislate from the bench and judicially create a joyriding exception when the plain language of MCL 500.3113(a) shows no such intent.

Although we are persuaded by Titan's position, we cannot render decisions based on speculation regarding what the current membership of the Supreme Court may decide. As stated, this Court in *Butterworth Hosp* specifically adopted the reasoning stated in the lead opinion in *Priesman*, and we are now bound by court rule to follow that decision.[34] However, were we not so bound to follow the *Butterworth* decision, we would

---

[31] See *Mester, supra* at 87; *Butterworth Hosp, supra* at 248.

[32] *Devillers v Auto Club Ins Ass'n,* 473 Mich 562, 582; 702 NW2d 539 (2005).

[33] *Id.* at 584, quoting *Robinson v Detroit,* 462 Mich 439, 463-464; 613 NW2d 307 (2000) (citations omitted).

[34] See MCR 7.215(J)(1).

instead follow Justice GRIFFIN's dissent in *Priesman*, in which he concluded that, by creating the joyriding exception, the lead opinion improperly "depart[ed] from the clear and unambiguous language of § 3113(a) . . . ."[35] As Justice GRIFFIN stated, although there may be "emotional appeal" to the rationale of the lead opinion that the legislators could not have meant to exclude coverage to young, joyriding family members given their own likely experience with that common occurrence, such an exception is not supported by the plain, unambiguous language of the statute.[36]

### 3. APPLYING THE FAMILY MEMBER JOYRIDING EXCEPTION

#### (a) FAMILY MEMBER'S VEHICLE

Having concluded that the family member joyriding exception is binding on this Court, we now turn to application of that exception to the present case. Therefore, we must determine whether Roberts's conduct falls within that scope of that exception; that is, whether Roberts was joyriding in a family member's vehicle.

Roberts concedes that the vehicle was titled to and owned by Vandenberg and that, therefore, the joyriding exception would seem to not apply.[37] However, Roberts argues that Irwin's use of the vehicle qualified her as an "owner" of the vehicle sufficient to fall within the scope of the exception.

The no-fault insurance act defines the term "owner" as:

(*i*) A person renting a motor vehicle or having the use thereof, under a lease or otherwise, for a period that is greater than 30 days.

---

[35] *Priesman, supra* at 69 (GRIFFIN, J., dissenting).

[36] *Id.* at 73.

[37] See *Allen, supra* at 346.

(*ii*) A person who holds the legal title to a vehicle, other than a person engaged in the business of leasing motor vehicles who is the lessor of a motor vehicle pursuant to a lease providing for the use of the motor vehicle by the lessee for a period that is greater than 30 days.

(*iii*) A person who has the immediate right of possession of a motor vehicle under an installment sale contract.[38]

Here, there is no dispute that Irwin did not hold legal title to the Explorer; Vandenberg was the title owner. Therefore, subsection (*ii*) does not apply. Further, there is no dispute that Irwin was not purchasing the vehicle under an installment sale contract. Therefore, subsection (*iii*) does not apply. Accordingly, we must determine if Irwin's use of the Explorer for a period greater than 30 days, as referred to in subsection (*i*), operated to classify her as an "owner" of the vehicle.

We first note that in applying the no-fault act's definition of "owner," this Court has recognized that there may be more than one "owner" of a vehicle.[39] For example, this Court has held that both a lessee and the legal titleholder could be owners under the no-fault act's definition of "owner," thereby requiring them both to maintain security for payment of benefits under PIP insurance.[40]

Where there is no lease agreement, " 'having the use' of a motor vehicle for purposes of defining 'owner' . . . means using the vehicle in ways that comport with concepts of ownership."[41] The focus must be on the

---

[38] MCL 500.3101(2)(h). We note that MCL 500.3101 was amended, effective July 17, 2008, redesignating the previous subsection 2(g) as 2(h). 2008 PA 241. However, the substance of the subsection remains unchanged.

[39] *Integral Ins Co v Maersk Container Service Co, Inc,* 206 Mich App 325, 332; 520 NW2d 656 (1994).

[40] *Id.,* citing MCL 500.3101(1).

[41] *Ardt v Titan Ins Co,* 233 Mich App 685, 690; 593 NW2d 215 (1999).

nature of the person's right to use the vehicle.[42] "[O]wn-ership follows from *proprietary* or *possessory* usage, as opposed to merely incidental usage under the direction or with the permission of another."[43] It is a "regular pattern of unsupervised usage" rather than "spotty and exceptional" usage that will support a finding of own-ership.[44]

**Here, given Vandenberg's and Irwin's testimo-nies, there can be no reasonable dispute that Vandenberg gave the Explorer to Irwin to use because her Jeep broke down right after she moved into his house and that thereafter she had exclusive use of that vehicle.**[45] As stated, there was no dispute in the record that Irwin used the vehicle for all her daily needs, and Vandenberg testified that if he had wanted to use the Explorer, he probably would have asked Irwin for permission first "because [he] gave it to her to use." Therefore, we conclude that Irwin's use of the car comports with the concepts of ownership. Fur-ther, the record indicates that Irwin had possessory use of the Explorer from approximately **May 1, 2005,**[46] until June 14, 2005. Therefore, the record establishes that Irwin had use of the vehicle for a period greater than 30 days. Accordingly, viewing the evidence in the light most favorable to Roberts, we conclude that there was no question of fact concerning Irwin's ownership.[47]

---

[42] *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 530; 676 NW2d 616 (2004).

[43] *Ardt, supra* at 691 (emphasis in original).

[44] *Id.*

[45] Material in bold type was changed during reconsideration of our December 4, 2008, opinion.

[46] Material in bold type was changed during reconsideration of our December 4, 2008, opinion.

[47] See *Botsford Gen Hosp v Citizens Ins Co*, 195 Mich App 127, 134; 489 NW2d 137 (1992).

### (b) ROBERTS'S INTENT

In *Butterworth*, this Court explained that MCL 500.3113(a) "does not apply to cases where the person taking the vehicle unlawfully is a family member doing so without the intent to steal but, instead, doing so for joyriding purposes."[48] Here, there was no evidence that Roberts intended to steal the vehicle. According to his testimony, after becoming intoxicated, he simply decided to take the vehicle for a drive.

Therefore, because Roberts was a family member joyriding rather than attempting to steal the car, under the precedent that *Butterworth* set by adopting the reasoning of the lead opinion in *Priesman*, he did not "unlawfully" take the car for purposes of MCL 500.3113(a) of the no-fault act and is thus not excluded from coverage under that provision.

### C. THE POLICY LANGUAGE

When presented with a contractual dispute, a court must read the contract as a whole with a view to ascertaining the intention of the parties, determining what the parties' agreement is, and enforcing it.[49]

---

[48] *Butterworth, supra* at 249. See MCL 750.413 ("Any person who shall, wilfully and without authority, take possession of and drive or take away . . . any motor vehicle, belonging to another, shall be guilty of a felony . . . ."); *Mester, supra* at 88 ("An unlawful taking does not require an intent to permanently deprive the owner of the vehicle . . . ."); see also MCL 750.414 ("Any person who takes or uses without authority any motor vehicle without intent to steal the same . . . is guilty of a misdemeanor . . . ."); *Landon v Titan Ins Co*, 251 Mich App 633, 644; 651 NW2d 93 (2002), quoting *People v Laur*, 128 Mich App 453, 455; 340 NW2d 655 (1983) (" 'To be convicted of this offense, a defendant must have intended to take or use the vehicle, knowing that he had no authority to do so.' ").

[49] *Detroit Trust Co v Howenstein*, 273 Mich 309, 313; 262 NW 920 (1935); *Whitaker v Citizens Ins Co*, 190 Mich App 436, 439; 476 NW2d 161

Absent ambiguity, a contract must be construed to adhere to its plain and ordinary meaning.[50] Technical and constrained constructions are to be avoided.[51]

> It is a cardinal principle of construction that a contract is to be construed as a whole; that all its parts are to be harmonized so far as reasonably possible; that every word in it is to be given effect, if possible; and that no part is to be taken as eliminated or stricken by some other part unless such a result is fairly inescapable.
>
> . . . Every word in the agreement must be taken to have been used for a purpose, and no word should be rejected as mere surplusage if the court can discover any reasonable purpose thereof which can be gathered from the whole instrument.[52]

"[C]lear and specific exclusions in an insurance policy should be given effect."[53]

### 1. UNLAWFULLY TAKEN VEHICLE

Under the terms of Irwin's Titan insurance policy, "coverage does **not** apply to **bodily injury** sustained by: 1. Any person using an **auto** taken unlawfully." (Emphasis in original.) Relying on this provision, Titan argues that the insurance policy alone clearly precludes coverage for Roberts's claims. However, "[t]o the degree that the contract is in conflict with the statute, it is

(1991); *Perry v Sied*, 461 Mich 680, 689 & n 10; 611 NW2d 516 (2000), citing 3 Corbin, Contracts, § 549, pp 183-186 (contracts are to be interpreted and their legal effects determined as a whole).

[50] *St Paul Fire & Marine Ins Co v Ingall*, 228 Mich App 101, 107; 577 NW2d 188 (1998).

[51] *Bianchi v Automobile Club of Michigan*, 437 Mich 65, 71 n 1; 467 NW2d 17 (1991).

[52] *Laevin v St Vincent de Paul Society*, 323 Mich 607, 609-610; 36 NW2d 163 (1949) (citations and quotation marks omitted).

[53] *Huggins v MIC Gen Ins Corp*, 228 Mich App 84, 90; 578 NW2d 326 (1998).

contrary to public policy and, therefore, invalid."[54] But "contracting parties are assumed to want their contract to be valid and enforceable," and "we are obligated to construe contracts that are potentially in conflict with a statute, and thus void as against public policy, where reasonably possible, to harmonize them with the statute."[55] Therefore, preferring a construction of the contract that renders it legal and enforceable, we construe this contract in a manner that renders it compatible with the existing public policy by concluding that the exclusion does not apply to a joyriding family member.[56]

### 2. MISREPRESENTATION

Although the trial court did not rule on the issue, Roberts argues that Titan was not entitled to void the insurance policy and therefore deny Roberts benefits on the basis of Irwin's alleged misrepresentations. Titan argues that Irwin fraudulently obtained insurance coverage by misrepresenting that she owned the Escort and, therefore, the insurance contract was void *ab initio*.

Irwin's insurance policy excludes coverage when the policy is obtained by fraud. Specifically, the policy states as follows:

> We do not provide coverage for any insured who has made fraudulent statements or engaged in fraudulent conduct in obtaining or maintaining this policy or concerning any **accident** or **loss** for which coverage is sought under this policy.

Further, it is a well-established rule that "[w]here a policy of insurance is procured through the insured's intentional misrepresentation of a material fact in the

---

[54] *Cruz v State Farm Mut Automobile Ins Co*, 466 Mich 588, 601; 648 NW2d 591 (2002).

[55] *Id.* at 599.

[56] See *id.*

application for insurance, and the person seeking to collect the no-fault benefits is the same person who procured the policy of insurance through fraud, an insurer may rescind an insurance policy and declare it void *ab initio*."[57]

Here, there is no dispute that Irwin lied to Titan when she said that she owned the Escort, which was actually owned and used by her son Vernon. And Irwin's misrepresentation was material to the risk insured because Titan would have increased the premium had it known the truth about the vehicle's ownership and usage. Karen Gines, an employee in Titan's underwriting department, attested that

> [t]he risk Titan assumed by issuing the policy to Lillian Irwin for the 1995 Ford Escort was substantially less than the actual risk assumed due to the car being owned by, in the possession of, and driven by Ms. Irwin's 19-year-old son, Vernon Austin, III. The risk of insuring a 19-year-old male is significantly greater than the risk of insuring a 36-year-old female.

Therefore, the Titan policy was procured through Irwin's intentional misrepresentation of a material fact in the application for insurance.

However, an insurer may not void a policy of insurance *ab initio* where an innocent third party is affected.[58] Therefore, " 'only the claim of an insured who has committed the fraud' will be barred, leaving unaffected 'the claim of any insured under the policy who is innocent of fraud.' "[59] Titan argues that this innocent

---

[57] *Darnell v Auto-Owners Ins Co*, 142 Mich App 1, 9; 369 NW2d 243 (1985).

[58] *Id.* at 10; see also *Hammoud v Metro Prop & Cas Ins Co*, 222 Mich App 485, 488; 563 NW2d 716 (1997).

[59] *Darnell, supra* at 10, quoting *Morgan v Cincinnati Ins Co*, 411 Mich 267, 277; 307 NW2d 53 (1981).

third party doctrine does not apply in this case because, given that Roberts is a minor, it is Irwin who is actually responsible for paying his medical expenses and therefore she is the person actually seeking to collect any insurance benefits.

However, caselaw demonstrates that the innocent third party doctrine ensures coverage for any person who is innocent of participation in the alleged fraud. For example in *Darnell v Auto-Owners Ins Co*, this Court held that the plaintiff was entitled to recover benefits where his wife, not the plaintiff, made the alleged misrepresentations.[60] In contrast, in *Hammoud v Metro Prop & Cas Ins Co*, this Court held that the plaintiff was not entitled to recover benefits because he was actively involved in defrauding the insurer by allowing his older brother to obtain the insurance policy by misrepresenting the plaintiff's status as a driver of the vehicle.[61] Therefore, the relevant inquiry is whether the injured third party was innocent with respect to the misrepresentation made to the insurance company or was actively involved in defrauding the insurer.

Here, it was Irwin, not Roberts, who is alleged to have misrepresented facts on the application for insurance. Consequently, while we certainly do not condone Irwin's actions, the fact remains that Roberts made no misrepresentation and coverage may not be denied to him on the basis of his mother's improper actions.

### 3. INSURABLE INTEREST

Titan also argues that Irwin did not have an insurable interest in the Escort; thus, the policy should be void. However, "there is no requirement that an insured

---

[60] *Darnell, supra* at 10.

[61] *Hammoud, supra* at 488-489.

actually own or be the registrant of a vehicle in order to have an insurable interest adequate to support PIP coverage."[62]

> [T]here is no requirement that there be an insurable interest in a specific automobile since an insurer is liable for personal protection benefits to its insured regardless of whether or not the vehicle named in the policy is involved in the accident. A person obviously has an insurable interest in his own health and well-being. This is the insurable interest which entitles persons to personal protection benefits regardless of whether a covered vehicle is involved.[63]

Therefore, the fact that Irwin may not have had an insurable interest in the Escort does not preclude recovery of PIP benefits.

### III. CONCLUSION

Despite our disagreement with *Butterworth*'s adoption of the *Priesman* lead opinion's reasoning regarding a family joyriding exception, it is controlling, and we must follow it as binding precedent.[64] We therefore reverse the trial court's grant of summary disposition in favor of Titan. In the absence of *Butterworth*, we would follow Justice GRIFFIN's dissent in *Priesman*, and we therefore declare a conflict between the present case and *Butterworth*.[65]

We reverse and remand for further proceedings consistent with this opinion. We do not retain jurisdiction.

---

[62] *Universal Underwriters Group v Allstate Ins Co*, 246 Mich App 713, 725; 635 NW2d 52 (2001).

[63] *Madar v League Gen Ins Co*, 152 Mich App 734, 739; 394 NW2d 90 (1986).

[64] MCR 7.215(J)(1).

[65] MCR 7.215(J)(2).

HOEKSTRA, P.J. *(concurring)*. I concur in the result only.