HARING CHARTER TWP v CITY OF CADILLAC
SELMA TWP v CITY OF CADILLAC

Docket Nos. 292122 and 292164. Submitted September 8, 2010, at
  Lansing. Decided October 12, 2010. Approved for publication
  November 23, 2010, at 9:25 a.m.

  Haring Charter Township and Selma and Clam Lake Townships
  brought separate actions in the Wexford Circuit Court against the
  city of Cadillac, raising counts for breach of contract, seeking specific
  performance, and requesting declaratory judgment regarding the
  parties' rights under disputed contracts. In 1977 and 1980, the
  townships, through Wexford County, entered into agreements with
  the city for the provision of wastewater treatment and disposal
  services. The agreements expressly provided they are to terminate on
  May 12, 2017, and may be renewed by mutual agreement of the
  parties. In 2006, defendant notified plaintiffs that it did not intend to
  renew the contracts after May 2017. These suits followed. The court,
  William M. Fagerman, J., consolidated the cases, and defendant
  moved for summary disposition of the request for declaratory judg-
  ment. Regarding the parties' rights under the agreements, plaintiffs
  asserted that they had not merely contracted for services for a finite
  length of time but had purchased a percentage of the system and thus
  had ownership rights that could not be terminated unilaterally by
  defendant. Plaintiffs asserted that defendant had a duty to provide
  wastewater treatment services through the "design life" of the
  system, which was, according to them, 75 years, and that the
  contracts only set forth the terms under which the services were to be
  provided. The court found there was no ambiguity in the contracts'
  termination clauses, concluding that plaintiffs had purchased "capac-
  ity" in the system for a fixed length of time, not ownership rights, and
  that federal regulations regarding "design life" did not create an
  ambiguity in the contracts. Under MCL 123.742, the contracts could
  not exceed 40 years, and their expiration date, set at 40 years from
  execution of the 1977 contract, showed the parties were aware of the
  statutory limitation. Defendant was not a public utility and so
  statutes concerning such entities were inapplicable. The court
  granted defendant's motion for summary disposition on the issue.
  Haring Township and Selma Township appealed separately, and the
  Court of Appeals consolidated the appeals.

The Court of Appeals *held*:

1. The contracts are unambiguous. Both the 1977 and 1980 contracts contain an explicit expiration date; they are fixed-term contracts that expire on May 12, 2017. Plaintiffs were purchasing "capacity" of the system for that length of time; there is no indication that plaintiffs were purchasing any ownership interest in defendant's facilities. To the contrary, the contracts explicitly provided that defendant's system and plaintiffs' systems are separate, and defendant and plaintiffs are separately responsible for the operation, maintenance, expansion, improvements, and administration of their own systems. There were no provisions in the contracts for shared ownership or for plaintiffs to have any ownership interest in defendant's system.

2. Under the Federal Water Pollution Control Act of 1972, the federal government provided grants for the construction and expansion of wastewater treatment works, but imposed certain requirements on recipients of grant funding. Grant money had to be used solely for the purposes of the project as approved. However, at the time the grants were awarded to defendant, the regulations did not require defendant to provide services to plaintiffs for the "design life" of the facilities. Nor did they require defendant to operate the treatment works in a particular manner or for a particular period of time. Defendant used the money according to the requirement that it be used solely for the project as approved.

3. Under MCL 123.742(1), the parties had discretion to enter into a contract for sewage disposal for a period not exceeding 40 years. Because this is discretionary, defendant is not a public utility and thus had no legal duty to continue to provide sewage disposal services beyond the unambiguous date of the contracts.

Affirmed.

JANSEN, J., dissenting, would have dismissed these matters as unripe for adjudication. The contracts had an express termination date of May 12, 2017. Although defendant gave notice in 2006 that it did not intend to renew the contracts after May 2017, it does not necessarily follow that future city administrators actually will decline to renew the contracts; they might instead decide to renew them and continue providing services to plaintiffs.

1. WASTE — WASTEWATER TREATMENT SERVICES — FEDERAL GRANTS — REQUIRE-
      MENTS.

   Federal grant money provided for the construction and expansion of
      wastewater treatment works imposes certain requirements on

recipients of grant funding; however, the regulations in effect in 1974 did not require the project to be operated for the length of its design life (40 CFR 35.935-1[b]).

2. MUNICIPAL CORPORATIONS — CONTRACTS — SEWAGE TREATMENT — TIME LIMIT.

Parties have discretion to enter into a contract for sewage disposal for a period not exceeding 40 years; this does not make either party a public utility and thus the parties have no legal duty to continue to provide sewage disposal services beyond the unambiguous date of the contracts (MCL 123.742[1]).

*Mika Meyers Beckett & Jones, PLC* (by *Ronald M. Redick*), and *Marco S. Menezes* for Haring Charter Township.

*Mika Meyers Beckett & Jones, PLC* (by *Ronald M. Redick*), for Selma Township.

*McCurdy Wotila & Porteous, Professional Corporation* (by *Roger L. Wotila* and *Nathan Piwowarski*), for the city of Cadillac.

Amici Curiae:

*Bauckham, Sparks, Lohrstorfer, Thall & Seeber, P.C.* (by *John H. Bauckham*), for the Michigan Townships Association.

*Varnum LLP* (by *Randall W. Kraker* and *Beverly Holaday*) for the Michigan Municipal League.

Before: BORRELLO, P.J., and JANSEN and BANDSTRA, JJ.

BANDSTRA, J. In Docket No. 292122, plaintiff, Haring Charter Township, appeals by leave granted the May 4, 2009, order granting partial summary disposition in favor of defendant, city of Cadillac. In Docket No. 292164, plaintiff, Selma Township, appeals as of right the May 4, 2009, order granting summary disposition in favor of defendant, city of Cadillac. We affirm.

## I. FACTS AND PROCEEDINGS BELOW

These consolidated cases arise from a dispute about the scope and meaning of contracts between plaintiffs and defendant for the provision of wastewater treatment services to the townships. By their express terms, these contracts expire on May 12, 2017. After defendant informed plaintiffs that it did not intend to renew the contracts, plaintiffs filed the instant actions asserting that defendant is obligated to continue providing wastewater treatment and disposal services to them for the "design life" of the treatment system, which plaintiffs assert to be at least 75 years. Plaintiffs do not dispute that the contracts specify an expiration date of May 12, 2017, but they argue that this date applies only to the particular terms and conditions set forth in the contracts and not to defendant's obligation to provide wastewater treatment services. Defendant moved for summary disposition, asserting that the contracts expire on May 12, 2017, as clearly and explicitly stated therein, and that it has no duty to provide wastewater treatment services to plaintiffs beyond that date. The trial court agreed, and granted defendant's motion.

### A. BACKGROUND

In 1975, having become concerned about water quality in Lake Cadillac and Lake Mitchell, plaintiffs, defendant, Cherry Grove Township, and Wexford County (the County), prepared a "Facilities Plan," as part of an application for grant funding under the Federal Water Pollution Prevention and Control Act of 1972, 33 USC 1251 *et seq.*, (more commonly referred to as the "Clean Water Act" or "CWA") for the expansion and improvement of defendant's wastewater treatment facilities to service the region. Required as part of the grant application process, the Facilities Plan sought "to

define the wastewater collection needs in the City of Cadillac for the next twenty year period" and to project the needs of the townships for wastewater treatment "through the year 1995." It originally envisioned eleven wastewater treatment service districts, primarily within the surrounding townships, creating a wastewater "treatment loop" around Lakes Mitchell and Cadillac to protect the lakes from adverse environmental effects arising from the presence and use of septic systems to manage waste. However, the Facilities Plan was amended by the parties to reflect that local political processes resulted in only certain service districts being approved by local governments for subsequent design and construction. The remaining service districts, including Haring Township, were not included in the initial implementation of the treatment system.

The portion of the Facilities Plan authored by the County utilized the following depreciation schedule, "assuming zero salvage value at the end of the period," when analyzing the cost effectiveness of various approaches to wastewater treatment for the affected areas:

| Land | Does not Depreciate |
|---|---|
| Structures (concrete, piping, earthwork, etc.) | 40 years |
| Process Equipment (lift stations, aeration equip., etc.) | 20 Years |
| Auxiliary equipment (electrical, lab equipment, auxiliary power, etc) | 15 years |

In this context, the County represented that no component of the treatment works, other than the land upon which it sits, had a service life longer than 40 years. Observing that the future projections would entirely consume the then-existing capacity of the treatment plant in 20 years, defendant, in its portion of the Facilities Plan, set treatment plant expansion for 1990.

Ultimately, defendant received approximately $5.3 million in grant funds for expanding and improving its existing treatment facility in accordance with the Facilities Plan. In 1977, defendant and the Wexford County Board of Public Works (on behalf of the then-participating townships of Selma, Clam Lake, and Cherry Grove) entered into a contract for the collection and treatment of wastewater from those townships (the 1977 Contract). This contract provided that the County would construct and operate sanitary sewer collection systems in the townships (the "County System") that the County would connect to defendant's system (the "City System") for transportation of all wastewater emanating from the County System to defendant's wastewater treatment plant for treatment and disposal. The 1977 Contract afforded the County certain "capacity rights": the right to send up to 360,000 gallons of wastewater daily to the City System for treatment and disposal. In exchange for reservation of this capacity, the County (on behalf of the then-participating townships) paid defendant $566,728, an amount constituting 18 percent of the local cost share of construction (including 18 percent of the local cost share of the 1962 construction of defendant's treatment plant) and corresponding to 18 percent, or 360,000 gallons daily, of the facility's then-existing treatment capacity of 2.0 million gallons daily (MGD). The 1977 Contract provided further:

1. The City, to the best of its ability, agrees to sell, and the County agrees to purchase, sewage treatment and disposal service for the County System. . . .

2. It is agreed that those portions of the City System within the City Limits shall remain the sole and exclusive responsibility of the City, for all operations, maintenance, expansions, additions, improvements and administration including review and revision of the charge for treatment.

3. It is agreed that those portions of the County System outside of the City Limits shall remain the sole and exclusive responsibility of the County for all operations, maintenance, expansion, additions, improvements and administration, unless otherwise provided in this Agreement. The County shall have the sole responsibility for expansion of the County System so long as the quantity of wastewater emanating from such County System, as expanded, does not exceed the capacity of the City System available to the County as authorized herein and set forth on Table 1. The County shall be responsible for all costs for distribution, maintenance and collection of charges for the County System.

Finally, the contract specified that it

shall become effective upon execution by the duly authorized representatives of the parties hereto and approval and confirmation by the Commission of the City of Cadillac, the Board of Public Works of the County of Wexford and the Wexford County Board of Commissioners, *and shall remain in effect for a period of forty (40) years from the date hereof*, and at the end of said forty (40) year period, this agreement *may be renewed for successive ten (10) year terms, by mutual agreement.* [Emphasis added.]

The effective date of the agreement being May 13, 1977, it is undisputed that the terms of the contract expire on May 12, 2017.

By 1980, Haring Township determined that it, too, wished to obtain wastewater treatment services via the County and City Systems. Accordingly, on April 8, 1980, the County, acting on behalf of Haring Township, entered into an agreement with defendant for the provision of additional wastewater treatment services to the County to accommodate Haring Township (the 1980 Contract). The 1980 Contract provided that the County would construct and operate a sanitary sewer system in Haring Township, which it would connect to the City System for the transportation of all wastewater

emanating from the Haring Township System to defendant's wastewater treatment plant for treatment and disposal.

Like the 1977 Contract, the 1980 Contract provides that the city agreed to sell and the County agreed to purchase "sewage treatment and disposal service," for Haring Township, "up to a maximum capacity of 100,000 gallons per day average daily flow," and the County agreed, "subject to the terms and conditions of an agreement between it and Haring Township," to pay buy-in costs of $69,283, an amount constituting five percent of the local cost share of construction (including 5 percent of the 70 percent local share of costs of the 1962 construction of defendant's wastewater treatment plant, as well as of later improvements to the treatment technology) and corresponding to a treatment capacity of 100,000 gallons per day average daily flow, or five percent of the then existing treatment capacity of 2.0 MGD. The 1980 Contract provided further that the

> operation, maintenance, expansion, improvements and additions, and administration (including the review and revision of rates and charges charged to users within the City) of the City System shall be and remain the sole and exclusive responsibility of the City. The County shall have no obligation[,] liability, or responsibility for the City System.
>
>               \*    \*    \*
>
> ... [T]he responsibility for operation, maintenance, expansion, additions, improvements, and administration (including review and revision of rates and charges to users outside the City and within the Haring Township System) shall be the sole and exclusive responsibility of the County. The City shall have no obligation, liability, or responsibility for the Haring Township System. The County, subject to the terms and conditions of an agreement between it and

Haring Township, shall have the ability to expand the Haring Township System within the [designated geographic] area . . . , so long as the quantity of wastewater emanating from the Haring Township System, as expanded, does not exceed the [contracted-for] capacity [of 100,000 gallons per day average daily flow]. The County, subject to the terms and conditions of an agreement between it and Haring Township, shall be responsible for all costs of distribution, maintenance and collection of charges for the Haring Township System.

The 1980 Contract also specified that it

shall become effective only upon its execution by the authorized representatives of the parties hereto after its approval and authorization for execution by the Commission of the City of Cadillac, the Board of the Department of Public Works and the Wexford County Board of Commissioners and the simultaneous execution of an agreement between the County and Haring Township after approval and authorization of execution of said agreement by the respective parties to that agreement. Once effective, *the agreement shall remain in effect until May 12 of the year 2017.* At that time, the agreement *may be renewed if the parties agree* for successive ten (10) year terms. *Either party may terminate this agreement at the end of the initial or subsequent terms upon a two (2) year written notice to the other party.* [Emphasis added.]

Defendant had undertaken several improvement projects to the treatment system, at a cost of nearly $6 million, during the 1990s, including projects to increase biological treatment measures, increase hydraulic capacity, and increase treatment and collection capacity, without financial contribution from the plaintiffs. In November 2006, defendant provided written notice to plaintiffs that it did not intend to renew the contracts upon their expiration in May 2017. Thereafter, Haring Township filed its three-count complaint, alleging that defendant has a legal obligation to continue providing

wastewater treatment and disposal service to the township after the "ostensible" expiration of the 1980 contract on May 12, 2017.[1] Shortly thereafter, Selma and Clam Lake Townships filed a one-count complaint also alleging that defendant has a legal obligation to continue providing wastewater treatment and disposal service beyond May 12, 2017.

### B. TRIAL COURT PROCEEDINGS

Defendant filed motions for summary disposition, under MCR 2.116(C)(8) and (10), asserting that the 1977 and 1980 contracts clearly provide it with the authority to discontinue wastewater treatment services to plaintiffs as of May 12, 2017. Plaintiffs responded by seeking summary disposition pursuant to MCR 2.116(I)(2), asserting, consistent with their complaints, that defendant has an obligation to continue to provide services after May 12, 2017. Plaintiffs asserted that under the terms of the 1977 and 1980 contracts, plaintiffs acquired contractual ownership of, and title to, a portion of the capacity of defendant's sewer system, that defendant is required to provide services to the townships through at least the expiration of the "design life" of the grant-funded sewage collection system pursuant to requirements imposed on defendant by the CWA's grant-funding program and associated federal regulations, and that defendant has held itself out as a public utility in the townships.

The trial court granted defendant's motions for summary disposition by written opinion and order, concluding that the language of the contracts was "clear and explicit" and provided a specific termination date of May 12, 2017, that permissive language allowing extensions of the contracts did not create a right in any of the contracting parties to an automatic extension, and that

---

[1] Haring Township's complaint sets forth three counts; only count III is at issue here.

it was required to enforce the contracts as written. In reaching this result, the trial court concluded that plaintiffs did not purchase an ownership interest in the sewer system, but rather purchased a certain capacity of service in terms of millions of gallons per day for a fixed term expiring on May 12, 2017. The trial court also rejected plaintiffs' argument that the contracts contain a latent ambiguity as a result of any obligation imposed by the CWA. Finally, the trial court concluded that defendant had not become a public utility within plaintiff townships.

II. ANALYSIS OF THE ISSUES RAISED ON APPEAL

On appeal, plaintiffs assert that the 1977 and 1980 contracts are both patently and latently ambiguous and that defendant has an extracontractual legal duty to continue providing wastewater treatment service to the townships beyond the expiration of the Contracts. Plaintiffs agree that

> the particular terms and conditions upon which the City has been providing sewage treatment and disposal services, as reflected in the 1977 and 1980 Contracts, unambiguously expire after May 12, 2017, such that the City does not thereafter have to provide [such services] to the Townships *on those particular terms and conditions.*

However, plaintiffs argue that, nonetheless, defendant "is legally obligated to continue providing sewage treatment and disposal services to the Townships after May 12, 2017," on "payment terms that comply with applicable state and federal law." Therefore, plaintiffs assert, the trial court erred by granting defendant's motions for summary disposition.

This Court reviews de novo a trial court's decision to grant summary disposition. *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999). This appeal also

involves questions of statutory and contract interpretation. "[B]oth the interpretation of a statute and a contract are questions of law this Court reviews de novo." *Burkhardt v Bailey*, 260 Mich App 636, 646; 680 NW2d 453 (2004). When interpreting a contract, this Court is to discern the parties' intent by reading the contract as a whole. *Roberts v Titan Ins Co (On Reconsideration)*, 282 Mich App 339, 357; 764 NW2d 304 (2009) ("When presented with a contractual dispute, a court must read the contract as a whole with a view to ascertaining the intention of the parties, determining what the parties' agreement is, and enforcing it."). If a contract is unambiguous, then it must be enforced by its plain terms. *DaimlerChrysler Corp v Wesco Distribution, Inc*, 281 Mich App 240, 248; 760 NW2d 828 (2008); *Rowe v Montgomery Ward & Co, Inc*, 437 Mich 627, 650; 473 NW2d 268 (1991). Terms are ambiguous *only if* they cannot possibly be read together in harmony. *Cole v Ladbroke Racing Mich, Inc*, 241 Mich App 1, 13; 614 NW2d 169 (2000). Furthermore, a court will not create ambiguity where none previously existed. *Smith v Physicians Health Plan, Inc*, 444 Mich 743, 759; 514 NW2d 150 (1994).

Plaintiffs first argue that they contracted not only for ongoing sewage treatment and disposal services from defendant, but that they also purchased—and thus own—capacity in the City System in the amounts designated in the respective contracts. They refer to their required, up-front, "buy-in" payments to defendant, corresponding "on a one-for-one basis with the actual costs-of-construction for the capacity that was granted to the Townships," and assert that considering these payments "it is absurd to suggest that the Townships were paying only for 'service' for a fixed term, instead of purchasing 'capacity.'" Plaintiffs further assert that they will continue to own capacity in the

City System after May 12, 2017, and that this ownership interest renders the expiration dates specified in the contracts "patently ambiguous." We disagree.

Both the 1977 and 1980 contracts contain an explicit expiration date; they are fixed-term contracts that expire on May 12, 2017. Indeed, plaintiffs acknowledge as much. Therefore, the trial court's conclusion that the contracts expire on that date was indisputably correct. Contrary to plaintiffs' arguments, we agree with the trial court that defendant's obligation to provide services under the contracts ends on May 12, 2017. The contracts do not provide for any automatic extension, or right to an extension; rather they provide only that the parties *may* by mutual agreement, extend the contracts. We find no patent or latent ambiguity in the plain expiration date set forth in the contracts.

Further, the up-front payments required by the contracts do not compel a different result. The contracts, by their plain terms, provide plaintiffs with the right to utilize a certain capacity—that is, with "capacity rights"—for a fixed term to expire as specified in the contracts. The contracts are thus akin to leases—here, for a certain amount of wastewater treatment capacity for a fixed term, in exchange for an up-front payment correlating to the cost of construction of the treatment system, together with monthly payments for the amount of wastewater actually treated.[2] There is no indication that plaintiffs were purchasing any ownership interest in defendant's facilities. The contracts explicitly provide that all responsibility for the opera-

---

[2] The contracts resemble a vehicle lease, in which a certain lump sum payment is due at signing, and additional monthly payments are made for the duration of the lease. In that situation, there is no basis for asserting that a lessee has purchased an ongoing ownership interest in the vehicle, merely because a percentage of its worth was paid at the start of the contract. Yet that is essentially what plaintiffs are asserting here.

tion, maintenance, expansion, improvements and administration of the City System rests exclusively with defendant and that the County was to have no obligation, liability, or responsibility for that system,[3] while at the same time the County was to bear all responsibility for the County System, including the Haring Township system, with the City bearing no obligation, liability, or responsibility for that system.[4]

Plaintiffs next argue that defendant has an ongoing obligation to provide wastewater treatment and disposal services beyond the expiration date of the contracts as a result of extrinsic requirements imposed on defendant by the CWA. Plaintiffs rely on 40 CFR 35.935-1(b), which sets forth the responsibilities borne by a grant recipient:

---

[3] The 1977 Contract specifically provides that "[i]t is agreed that those portions of the City System within the City Limits *shall remain the sole and exclusive responsibility of the City*, for all operations, maintenance, expansions, additions, improvements and administration including review and revision of the charge for treatment." (Emphasis added.) Likewise, the 1980 Contract states that

[i]t is agreed by the parties that the operation, maintenance, expansion, improvements and additions, and administration (including the review and revision of the rates and charges charged to users within the City) of the City System shall be and remain the *sole and exclusive responsibility of the City. The County shall have no obligation[,] liability, or responsibility for the City System.* [Emphasis added.]

[4] The 1977 Contract provides that "[i]t is agreed that those portions of the County System outside of the City Limits shall remain the sole and exclusive responsibility of the County for all operations, maintenance, expansions, additions, improvements and administration, unless otherwise provided in this Agreement." Similarly, the 1980 Contract provides that

[i]t is agreed that the responsibility for operation, maintenance, expansion, additions, improvements, and administration (including review and revision of rates and charges to users outside the City and within the Haring Township System) shall be the sole and exclusive responsibility of the County. The City shall have no obligation, liability, or responsibility for the Haring Township System.

By its acceptance of the grant, the grantee agrees to complete the treatment works in accordance with the facilities plan, plans and specifications, and related grant documents approved by the Regional Administrator, and to maintain and operate the treatment works to meet the enforceable requirements of the Act for the design life of the treatment works. The Regional Administrator is authorized to seek specific enforcement or recovery of funds from the grantee, or to take other appropriate action . . . if he determines that the grantee has failed to make good faith efforts to meet its obligations under the grant.

Plaintiffs argue that, pursuant to this regulation, defendant is obligated to provide wastewater treatment service to them for the "design life" of the treatment facility, regardless of the term of the contract, and further, that the "design life" of the instant treatment system is 75 years to perpetuity, as averred by plaintiffs' engineering expert. Plaintiffs cite *State Hwy Comm'r v Detroit City Controller*, 331 Mich 337, 352; 49 NW2d 318 (1951), to establish that parties reach agreements with awareness of the statutory law in effect at the time of the agreement and therefore that statutory law becomes part of the agreement, and *Universal Underwriters Ins Co v Kneeland*, 464 Mich 491, 496-498; 628 NW2d 491 (2001), and *Stillman v Goldfarb*, 172 Mich App 231, 239-241; 431 NW2d 247 (1988), to establish that courts are compelled to construe contracts in accordance with applicable statutory law whenever it is possible to do so. Thus, plaintiffs assert that "the obligations of the CWA clearly 'enter into and form a part' of the Contracts" and therefore, defendant has a continuing obligation to provide wastewater treatment services beyond May 12, 2017, as part of those contracts.[5]

---

[5] Plaintiffs note that they are not asserting "direct claims against the City under the CWA," but, rather, are

As plaintiffs acknowledge, however, 40 CFR 35.935-1(b), is not applicable here because it was not in effect in 1975, when the Facilities Plan was prepared and submitted, or in 1976 and 1977 when the grants were actually awarded to defendant; 40 CFR 35.935-1 did not go into effect until October 1, 1978. 43 Fed Reg 44022 (September 27, 1978). Therefore, as plaintiffs acknowledge before this court, "these grants were subject to the 1974 [United States Environmental Protection Agency (EPA)] regulations." The 1974 regulations speak in terms of the "service life" of various parts of the treatments works, which the regulations define as the "period of time during which a component of a waste treatment management system will be capable of performing a function." 40 CFR Appendix A(d)(4); 39 Fed Reg 5269 (February 11, 1974). The regulations further provide that

> The service life of treatment works for a cost-effectiveness analysis shall be as follows:
>
> Land................................. Permanent
>
> Structures ........................... 30-50 years
>
> (includes plant buildings, concrete process tankage, basins, etc.; sewage collection and conveyance pipelines; lift station structures; tunnels; outfalls)[.]

relying upon the CWA and its implementing regulations for the purpose of demonstrating that the ostensible May 12, 2017 expiration date of the Contracts could not, at the time of Contract formation, have been understood by the parties to represent a date at which the City could wholly abandon its obligation to provide sewage treatment and disposal services to the Service Districts within the Townships.

In fact, while the CWA regulation upon which plaintiffs seek to rely authorizes the regional administrator to take action if he determines that the grantee is not compliant with the requirements and regulations governing use of the grant and the resulting treatment works, it does not confer standing on private parties to seek such enforcement. 40 CFR 35.935-1(b).

Process equipment . . . . . . . . . . . . . . . . . . . 15-30 years

(includes major process equipment such as clarifier mechanisms, vacuum filters, etc.; steel process tankage and chemical storage facilities; electrical generating facilities on standby service only).

Auxiliary equipment . . . . . . . . . . . . . . . . . 10-15 years

(includes instruments and control facilities; sewage pumps and electric motors; mechanical equipment such as compressors, aeration systems, centrifuges, chlorinators, etc,; electrical generating facilities on regular service).

Other service life periods will be acceptable when sufficient justification can be provided. [CFR 40 Appendix A(f)(7); 39 Fed Reg 5270 (February 11, 1974).]

Accordingly, as previously noted, the cost-effectiveness analysis set forth in the 1975 Facilities Plan, submitted by the parties as part of their application for grant funding under the CWA, identifies the service life of the components of the treatment works as follows:

| Land | Does not Depreciate |
| --- | --- |
| Structures (concrete, piping, earthwork, etc.) | 40 years |
| Process Equipment (lift stations, aeration equip., etc.) | 20 Years |
| Auxiliary equipment (electrical, lab equipment, auxiliary power, etc) | 15 years |

Plaintiffs assert that 40 CFR 35.935-1(b), although not directly applicable here, merely reflects a preexisting requirement culled from a combination of then-existing EPA regulations and grant documents and thus that the obligation to provide service for the "design life" of the treatment works was part of the parties' agreement, regardless of the effective dates of that agreement. More specifically, plaintiffs note that the 1974 regulations required that defendant use the

awarded grant funds to complete the construction of an "operable treatment works" and "a complete waste treatment system . . . of which the project is a part," 40 CFR 35.935-1 and 35.905-3, and further, that grant agreements signed by defendant require that the treatment works be "completed as a cost-effective, integral component of the overall program to provide a complete waste treatment system," and that the grantee "agrees that the funds awarded will be used solely for the purposes of the project as approved," here, to "service the City of Cadillac and portions of the townships" with wastewater treatment services. Plaintiffs assert that the 1974 regulations and grant agreements, considered together, require that defendant use the grant monies solely for the purposes of providing wastewater collection, transport, treatment, and disposal services to the designated township service districts, and that if defendant ceases using the treatment works to collect, transport, treat, and dispose of plaintiffs' wastewater, it will have ceased using the grant monies "solely for the purposes of the project approved" in violation of the 1974 regulations. From this, plaintiffs assert that defendant has a continuing extracontractual duty to operate the treatment works for the benefit of plaintiff townships for the "design life" of the treatment works, which plaintiffs assert is at least 75 years. We disagree.

There is no dispute that the grant monies received by defendant were, in fact, used "solely for the purposes of the project as approved": to construct the treatment works described in the approved Facilities Plan. There is no assertion that defendant misappropriated grant funds for any other purpose. There is nothing in the regulations explicitly imposing a perpetual duty to operate the treatment works in a particular manner or for a particular period of time. The 1974 regulations required that the Facilities Plan include a "cost-

effectiveness analysis" defining the service life of the treatment works's various component parts, 40 CFR 35.917-1(d); 39 Fed Reg 5253 (February 11, 1974), and the 1975 Facilities Plan did so, indicating that no component's service life exceeded 40 years, consistent with the applicable regulation.

Additionally, plaintiffs' argument completely disregards the import of the term "service life" and the definition of "service life" provided in the 1974 regulations. Plaintiffs continue to refer to "design life": the term used in the 1978 regulations. Plaintiffs correctly point out that the 1974 regulations define "service life" in the context, and for purposes, of cost-effectiveness analysis. However, plaintiffs can point to nothing in the 1974 regulations specifically obligating defendant to operate the treatment works for the "design life" of the system, or indeed, for any particular period of time. Rather, as pieced together by plaintiffs, the regulations require that defendant complete and operate the project as approved: that is, as set forth by the Facilities Plan, which included the parties' representation of the service life of the system's components. In this regard, we find the definition of "service life" set forth in the 1974 regulations to be persuasive in considering whether the CWA and its implementing regulations impose any duty on defendant to operate the treatment works beyond the expiration date of the contracts. We conclude that the regulations impose no such duty.

Defendant completed construction of the treatment works in accordance with the Facilities Plan and has maintained and operated the treatment works as contemplated; plaintiffs do not assert otherwise. At issue is simply whether on May 12, 2017, defendant will have done so for the proper amount of time, or whether defendant is obligated to continue to provide such services

beyond that date. Considering the 1974 regulations and the representations set forth in the approved Facilities Plan, we conclude that it will have done so, and there being no ambiguity in the expiration date set forth in the 1977 and 1980 contracts, the contracts, and all accompanying duties expire on that date.[6]

Finally, plaintiffs argue that defendant has held itself out as a public utility in plaintiff townships and as a consequence defendant remains obligated to continue providing sewer service to the townships beyond the expiration of the contract. In support of this assertion, plaintiffs note the definition of a public utility set forth in *Schurtz v Grand Rapids*, 208 Mich 510, 524; 175 NW 421 (1919):

---

[6] Both parties note that MCL 123.742(1) provides:

> A county operating under this act and any 1 or more municipalities including the county itself may enter in a contract or contracts for the acquisition, improvement, enlargement, or extension of a water supply, *a sewage disposal,* or a refuse system, or the making of lake improvements or erosion control systems and for the payment of the costs by the contracting municipalities, with interest, over a period not exceeding 40 years.

Thus, plainly under Michigan law, the 1977 and 1980 contracts could not exceed 40 years in duration. Defendant points to this as further evidence that the parties understood that defendant's obligation to provide services could not extend beyond the expiration date of the contracts. Plaintiffs argue, however, that the existence of the statute, which prevented the parties from contracting for a term exceeding 40 years regardless of any continuing duty on the part of defendant to operate the treatment facility for plaintiffs' benefit beyond that period of time, demonstrates, again, a latent ambiguity with regard to the import and effect of that expiration date on defendant's duty to provide treatment services. In advancing this argument, plaintiffs rely on the notion that they purchased, and continue to own, capacity in defendant's system. However, for the reasons previously discussed, plaintiffs do not own capacity in defendant's treatment system, and defendant has no ongoing, underlying legal duty to continue to provide wastewater treatment services to plaintiffs beyond the plain and unambiguous date set forth in the contracts.

"[P]ublic utility" means every corporation . . . that may
own, control, or manage, except for private use, any equip-
ment, plant or generating machinery in the operation of a
public business or utility. Utility means the state or quality
of being useful. Was this plant one useful to the public? If
so, it was a public utility.

Plaintiffs observe that defendant is the only source of
sewage treatment in the townships. Plaintiffs assert
that "[i]t cannot be doubted . . . that the City Sewage
System is a 'public utility' for purposes of Michigan
law" and that defendant has held itself out as a public
utility within certain areas of the townships by entering
into the 1977 and 1980 contracts. However, Michigan
law provides municipalities with the discretion to pro-
vide services to extraterritorial units such as the town-
ships. See MCL 123.742(1); *Nelson v Wayne Co*, 289
Mich 284, 297-299; 286 NW 617 (1939).[7] Additionally,
the Michigan Constitution, as well as Michigan statu-
tory law, provides for and recognizes defendant's discre-

---

[7] The plaintiff in *Nelson* challenged the denial of his request to tap into
a water main constructed under a contract entered into between the
Detroit Board of Water Commissioners and Wayne County to supply
water from Detroit to the Wayne County Training School. The Supreme
Court affirmed that denial, explaining that

[t]he courts as a rule are not disposed to interfere with the
management of an authorized business, conducted by the munici-
pal authorities presumably in the interest and for the benefit of
the city and its inhabitants, unless dishonesty or fraud is manifest,
or the vested power with its implied discretion has been clearly
exceeded or grossly abused. . . .

. . . [A city] may conduct [a utility] in the manner which
promises the greatest benefit to the city and its inhabitants in the
judgment of the city council; and it is not within the province of
the court to interfere with the reasonable discretion of the council
in such matters. [*Nelson*, 289 Mich at 297-298 (quotation marks
and citations omitted).]

tion in extending sewage removal services beyond its border. Article 7, § 24 of the 1963 Michigan Constitution provides that

> [s]ubject to this constitution, any city or village *may* acquire, own or operate, within *or without* its corporate limits, public service facilities for supplying water, light, heat, power, sewage disposal and transportation to the municipality and the inhabitants thereof.
>
> Any city or village may sell and deliver heat, power or light without its corporate limits in an amount not exceeding 25 percent of that furnished by it within the corporate limits, except as greater amounts may be permitted by law; *may sell and deliver water and provide sewage disposal services outside of its corporate limits in such amount as may be determined by the legislative body of the city or village*; and may operate transportation lines outside the municipality within such limits as may be prescribed by law. [Emphasis added.]

Likewise, MCL 123.742(1) provides that municipalities "*may* enter into a contract or contracts for . . . *sewage disposal* . . . for the payment of the costs by the contracting municipalities, with interest, over a period not exceeding 40 years." (Emphasis added.) And, MCL 123.232 provides that "[a]ny 2 or more political subdivisions *may* contract for the joint ownership, use and/or operation of sewers and/or sewage disposal facilities. . . . Any such contract . . . shall be effective for such term as shall be prescribed therein not exceeding 50 years." Each of these provisions contains the term "may," indicating permissive, discretionary activity. *Gulley-Reaves v Baciewicz*, 260 Mich App 478, 485; 679 NW2d 98 (2004). Thus, plainly, Michigan law affords defendant the ability to provide sewage treatment services beyond its borders, subject to contracts of limited duration; however, there is nothing in Michigan law requiring that defendant do so. Simply by exercising its

discretion to provide wastewater treatment services to plaintiffs for a fixed duration in accordance with applicable law, defendant did not become a public utility obligated to continue to provide that service beyond the expiration of the contract.

In sum, the issue presented here is straightforward: Do the 1977 and 1980 contracts expire on May 12, 2017, as plainly stated therein? We find no basis for concluding that the contracts mean anything other than that which they plainly provide. Therefore, the trial court did not err by concluding that defendant's duty to provide wastewater treatment services to plaintiffs was governed by the 1977 and 1980 contracts, which expire "as prescribed therein," on May 12, 2017.[8]

We affirm. Defendant, being the prevailing party, may tax costs pursuant to MCR 7.219.

BORELLO, P.J., concurred.

JANSEN, J. (*dissenting*). Because I would dismiss these consolidated matters as unripe for adjudication, I respectfully dissent. Defendant city of Cadillac executed contracts with plaintiff townships for the provision of wastewater treatment services. By their express terms, these contracts were set to expire May 12, 2017. The contracts provided that "[e]ither party may terminate this agreement at the end of the initial term or subsequent terms upon a two (2) year written notice to the other party." In November 2006, defendant provided written notice to plaintiffs that it did not intend to renew the contracts upon their expiration in May 2017.

---

[8] Having determined that defendant is not obligated to provide wastewater treatment services for the "design life" of the treatment works, we need not address the issue whether plaintiffs successfully established a genuine issue of material fact as to the length of the "design life" of the system.

Thereafter, plaintiffs brought the instant actions in the Wexford Circuit Court, alleging that defendant had a legal obligation to continue providing wastewater treatment services to them beyond that date. With respect to this issue, the circuit court ultimately granted summary disposition for defendant, ruling that defendant was entitled to abide by the express termination date of May 12, 2017, and that defendant could accordingly terminate its services to plaintiffs at that time.

In my opinion, these consolidated matters are unripe for adjudication. At the time of the circuit court's ruling, the termination date of the parties' contracts remained years away. Indeed, defendant was not contractually required to provide written notice of its intent to terminate the contracts until two years before May 2017—in other words, May 2015, still almost five years in the future. Although defendant notified plaintiffs in November 2006 that it did not intend to renew the contracts or continue providing wastewater treatment services beyond May 2017, it does not necessarily follow that defendant *will actually* terminate its services to plaintiffs at that time. While Cadillac's current city council and city administrators may fully intend to terminate the wastewater treatment services to plaintiffs on May 12, 2017, it is axiomatic that one city council may not bind its successors in office. See *Hazel Park v Potter*, 169 Mich App 714, 722-723; 426 NW2d 789 (1988); see also *Malcolm v East Detroit*, 437 Mich 132, 139; 468 NW2d 479 (1991). In fact, future Cadillac city councils and city administrators may view the situation completely differently, and might, for reasons unknowable at this time, determine that the contracts should be renewed and that the services should be continued. The point is that we simply do not know what will happen in the future, and therefore the present controversy strikes me as entirely unripe for

judicial consideration. See *Citizens Protecting Michigan's Constitution v Secretary of State*, 280 Mich App 273, 282; 761 NW2d 210 (2008) (stating that "[a] claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or may not occur at all"); *Huntington Woods v Detroit*, 279 Mich App 603, 615-616; 761 NW2d 127 (2008) (observing that "[t]he doctrine of ripeness is designed to prevent the adjudication of hypothetical or contingent claims before an actual injury has been sustained" and that "[a] claim is not ripe if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all") (quotation marks and citations omitted). It is well settled that "[t]he ripeness doctrine requires the judiciary to refrain from giving advisory opinions on hypothetical issues." 1A CJS, Actions, § 75, p 287.

Because these consolidated matters are not yet ripe for adjudication, the circuit court should have dismissed plaintiffs' claims on the ground of ripeness. I would dismiss the present consolidated appeals for this same reason.