*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MARK A. DITTENBIR, M.D.,

      Plaintiff/Counterdefendant-Appellee,

v

BRONSON HEALTHCARE MIDWEST,
BRONSON METHODIST HOSPITAL, and
BRONSON HEALTHCARE GROUP, INC., doing
business as BRONSON HEALTHCARE,

      Defendants/Counterplaintiffs-
      Appellants.

UNPUBLISHED
February 12, 2025
9:08 AM

No. 366529
Kalamazoo Circuit Court
LC No. 2019-000274-CK

MARK A. DITTENBIR, M.D.,

      Plaintiff/Counterdefendant-Appellant,

v

BRONSON HEALTHCARE MIDWEST,
BRONSON METHODIST HOSPITAL, and
BRONSON HEALTHCARE GROUP, INC., doing
business as BRONSON HEALTHCARE,

      Defendants/Counterplaintiffs-
      Appellees.

No. 366530
Kalamazoo Circuit Court
LC No. 2019-000274-CK

Before: SWARTZLE, P.J., and K. F. KELLY and MURRAY, JJ.

PER CURIAM.

This is a consolidated appeal involving a compensation dispute. Following a bench trial, the trial court awarded judgment in favor of plaintiff/counterdefendant, Dr. Mark A. Dittenbir, on his claims against defendants/counterplaintiffs for unjust enrichment, implied contract, and

-1-

quantum meruit, and ultimately awarded him $409,920 in damages. The trial court also dismissed defendants' counterclaim to recover a $240,500 alleged overpayment to plaintiff.

In Docket No. 366529, defendants appeal by right the amended order, asserting that the trial court erred as a matter of law by concluding that plaintiff's express contract with defendants did not bar plaintiff's equitable, quasi-contract claims and that, if plaintiff's claims were not barred, by failing to deduct from plaintiff's damages award the $322,911.32 that defendants had already paid him for surgical services. Defendants also argue that the trial court erred by dismissing their counterclaim for $240,500 that they mistakenly paid plaintiff. We affirm the trial court's orders finding an implied contract, declining to set off $322,911.32 from the amount that defendants were ordered to reimburse plaintiff, and dismissing defendants' counterclaim.

In Docket No. 366530, a consolidated appeal, plaintiff appeals the same order, asserting that he was entitled to a fair market hourly rate of $212.71 for his services and that the trial court clearly erred by awarding him $409,920 when the great weight of the evidence established that fair market value of his services was $1,447.038.88. We affirm the trial court's fair-market-value determination but remand for the trial court to correct the amount of plaintiff's damages award to $415,044.

## I. FACTS

Plaintiff is a general surgeon and former shareholder of Healthcare Midwest, a private group practice comprised of various medical specialists, as well as general and vascular surgeons. In 2010, plaintiff was involved in launching "Unassigned Surgical Services" at Bronson Methodist Hospital, a service that provided acute-care surgical services for "unassigned" patients, i.e., individuals who presented at Bronson Methodist Hospital in urgent need of surgical services, but who did not have a previous relationship with a surgeon (henceforth "BGS services"). In 2012, defendants contracted with Healthcare Midwest to provide BGS services. The contract required Healthcare Midwest to provide coverage for BGS services for three out of four weeks by having each full-time participating surgeon spend one 60-hour week at Bronson Methodist Hospital on a rotating basis. Defendants paid Healthcare Midwest a flat fee of $212.71 an hour for BGS services provided from 7:00 a.m. to 7:00 p.m. In addition, defendants paid Healthcare Midwest $100 an hour to provide on-call surgeons from 7:00 p.m. until 7:00 a.m. Weekend compensation was $212.71 an hour for the first six daytime hours of in-house service; the remaining hours were compensated at $100 an hour. Defendants retained the income generated by the procedures that the surgeons performed.

Conversations began in late 2012 about the possibility of defendants acquiring the assets of Healthcare Midwest, including its physicians. Healthcare Midwest was represented in the negotiations primarily by its chief executive officer, James McKernan; defendants were represented primarily by one of their vice presidents, John Jones, Jr. Among the preacquisition concerns for Healthcare Midwest was what BGS services would look like after the acquisition. Healthcare Midwest surgeons who provided BGS services were concerned about a potential loss of income under defendants' compensation model, specifically because they believed that that model did not consider the amount of work and time required to provide daytime BGS services because defendants' productivity-oriented method of compensation was based on WRVUs, i.e., "work related value units." Plaintiff and others believed that WRVU-based compensation was

inadequate for BGS services because the surgeons saw very sick, emergency room patients who required additional time and interactions that were not accounted for by WRVUs.

In March 2013, plaintiff and other Healthcare Midwest shareholders signed a ballot that permitted McKernan and other authorized representatives to negotiate on the shareholders' behalf any changes to a template employment agreement between defendants and the shareholders that McKernan deemed to be in their best interests and that of Healthcare Midwest. The ballot also authorized McKernan to act as plaintiff's agent to negotiate modifications to the template employment agreement "to address matters specific to" plaintiff that would then appear in plaintiff's individual employment agreement. In June 2013, plaintiff signed an employment agreement with Bronson Healthcare Midwest (BHM), which was, essentially, the postacquisition successor to Healthcare Midwest.

Paragraph 3 of the employment agreement stated that, as his "compensation for all services rendered during the term of this Agreement, Physician shall receive the amounts described in Exhibit A . . . ." Exhibit A provided that plaintiff would receive first-year compensation of $432,102, plus incentives. In addition, "and notwithstanding any other provisions of this Exhibit or the attached Employment Agreement to the contrary," plaintiff was "entitled to receive" approved service arrangement (ASA) income for, among other things, "General Surgery Service Panel." Exhibit A defined an ASA as an agreement under which a physician performed professional, administrative, or other services. To be valid, the agreement had to (1) be described in Exhibit A or another written document, (2) be signed by the physician, (3) state the effective date of Exhibit A or the other written document, and (4) state the amount that the physician would receive as ASA income. Before signing the employment agreement, plaintiff confirmed with McKernan that "General Surgery Service Panel" referred to BGS services, and McKernan told him that a "contract specific to call" would arrive shortly.

At some point, BHM and Bronson Methodist Hospital signed a "General Surgical Services Agreement" (henceforth, "BGS agreement"). The agreement required BHM surgeons to provide Bronson Methodist Hospital with continuous in-house dedicated BGS services from 7:00 a.m. to 7:00 p.m. Monday through Friday, three weeks out of four. Coverage was to be on a rotating basis, with each BHM surgeon covering a full 60 hours of dedicated in-house coverage. In addition, $73,200 would be withheld from the base compensation of the BGS services providers to fund a call pool. Generally, physicians who provided BGS services from 7:00 p.m. until 7:00 a.m. Monday through Friday, and from 7:00 p.m. on Fridays until 7:00 a.m. on Mondays, would be compensated out of the pool at the rate of $1,200 per 12-hour shift. The BGS agreement was undated and signed on behalf of BHM by McKernan and on behalf of Bronson Methodist Hospital by Kenneth Taft.

From shortly after the July 1, 2013 acquisition until 2018, plaintiff and Dr. Philip Borozan, another former Healthcare Midwest surgeon who provided BGS services, made two or three inquiries into how they were paid for BGS services. In August 2018, plaintiff met with Dr. Robert Isacksen, the president of Bronson Medical Group, to raise issues about his compensation. Two issues were important for the instant appeal. First, plaintiff observed that in-house compensation for the one week out of four that he provided BGS services had historically been $212.71 an hour for 60 hours. However, since defendants' acquisition of Healthcare Midwest, that rate had been reduced and then stopped without explanation in October 2016. Next, plaintiff objected to the

method of "rewarding night and weekend" BGS services by subtracting $73,200 of "fairly earned" compensation to create a pool out of which surgeons would then be paid for these services. After investigating these two issues, defendants determined that the $74,000 additions to plaintiff's annual compensation had been discontinued when it was discovered that defendants had never agreed to such additions, and, as to the call pool, that defendants were following their agreements with plaintiff.

Unsatisfied, plaintiff filed a four-count complaint alleging unjust enrichment (Count I), implied contract (Count II), quantum meruit (Count III), and breach of contract (Count IV). With respect to his equitable claims, plaintiff generally asserted that he did not have a written agreement addressing BGS services, that he had continuously provided BGS services since the acquisition, that defendants had benefited from these services, and that he was entitled to fair and reasonable compensation for the services that he had provided. Plaintiff also alleged that defendants breached their contract with him by not fairly and reasonably compensating him for BGS services and by not presenting him with a proposed agreement that specifically delineated the compensation for plaintiff's BGS services.

In lieu of an answer, defendants moved for summary disposition. Defendants argued that plaintiff's breach-of-contract claim failed because plaintiff's employment agreement and the BGS agreement were in writing and specifically addressed his compensation, that plaintiff's equitable claims failed because plaintiff signed a written consent permitting McKernan to act as his agent to "address matters specific to" plaintiff's individual employment agreement, and that plaintiff worked and was compensated in accordance with this agreement.

The trial court granted summary disposition of Count IV (breach of contract) in favor of defendants, granted summary disposition of Counts I through III in favor of defendants with respect to some aspects of plaintiff's claim that are not at issue in the present appeal, and denied summary disposition of plaintiff's claims that he had been undercompensated for BGS services. Plaintiff amended his complaint to delete his claim for breach of contract. In its answer, defendants asserted a counterclaim seeking to recover $240,500: the sum of the annual, unauthorized additions of $74,000 to plaintiff's salary.

At the conclusion of a nine-day bench trial, the trial court found that plaintiff's BGS services would be treated separately from the services that he provided to patients who were assigned to him. Recognizing that the BGS agreement was meant to be an ASA contract, the court agreed with plaintiff that it was not valid and that plaintiff was not paid what he was owed, as the BGS agreement was not signed or approved by plaintiff and the evidence showed that defendants "unilaterally decided what and how [they] would compensate Plaintiff for the general surgery services to unassigned patients which included reducing Plaintiff's base salary." Accordingly, the court determined that there was no express written agreement covering plaintiff's compensation for BGS services, and it implied a contract for the provision of BGS services and decided "on the fair market value" of plaintiff's compensation.

The trial court found that plaintiff provided 7,656 hours of BGS services over 5.6 years and that defendants compensated him $181,468.88, which the court concluded was the fair market value for plaintiff's BGS services. Nevertheless, the court also found that plaintiff should have been paid his full salary during the 5.6 years that he operated under his employment agreement,

but that "Plaintiff's salary was reduced $73,200/year, then Plaintiff was underpaid his full salary by $366,000." The court ordered defendants to pay plaintiff this amount. As to defendants' counterclaim, the court concluded that, "given the Court's ruling above, this Court finds no cause of action on [defendants'] Counter-Complaint."

Both parties moved to amend the judgment. Defendants asserted that the $366,000 should have been offset by the $321,758.80 that defendants had already returned to plaintiff out of the call pool, and moved to amend the judgment to reflect that defendants owed plaintiff only $55,241.20. Plaintiff moved to amend the judgment to correct a mathematical error. The trial court calculated plaintiff's damages at $336,000 ($73,200 x 5.6 years) when, in fact, the product was $409,920. Plaintiff also contended that he provided BGS services for defendants for 5.67 years, not 5.6 years, and he urged the trial court to reflect that correction as well, and to order defendants to pay damages of $415,044. Plaintiff further argued that the trial court erred by finding that $181,468.88 was fair market value for the 7,656 hours of BGS services that he provided. He contended that evidence established a fair market hourly rate for BGS services was $212.71. Accordingly, plaintiff urged the trial court to amend the final judgment to award him $1,628,507.76 minus $181,468.88 for a total award of $1,447,038.88 as fair market value for his BGS services.

After argument, the trial court concluded that the finding that plaintiff provided BGS services for 5.6 years did not align with the court's order to defendants to pay plaintiff $366,000, as the actual amount should have been $409,920. Accordingly, the court amended the judgment to require defendants to pay plaintiff $409,920, plus interest and costs.

## II. ANALYSIS

### A. DOCKET NO. 366529

Defendants first contend that the trial court erred as a matter of law when it concluded that plaintiff's equitable, quasi-contract claims were not barred by plaintiff's employment agreement.

We review "a trial court's findings of fact in a bench trial for clear error and its conclusions of law de novo." *Bayberry Group, Inc v Crystal Beach Condo Ass'n*, 334 Mich App 385, 392; 964 NW2d 846 (2020) (quotation marks and citation omitted). A finding is clearly erroneous when, "after reviewing the entire record, this Court is left with a definite and firm conviction that a mistake has been made." *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003). The interpretation of a contract is a question of law, which we review de novo. *Haring Charter Twp v Cadillac*, 290 Mich App 728, 739; 811 NW2d 74 (2010).

"An implied-in-law contract is a legal fiction to enable justice be accomplished even if there was no meeting of the minds and no contract was intended." *AFT Mich v Michigan*, 303 Mich App 651, 660; 846 NW2d 583 (2014) (quotation marks and citation omitted), aff'd 497 Mich 197 (2015). A contract may be implied in law when "there is a receipt of a benefit by a defendant from a plaintiff and retention of the benefit is inequitable, absent reasonable compensation." *In re Lewis Estate*, 168 Mich App 70, 74; 423 NW2d 600 (1988). However, courts "may not imply a contract if the parties have an express contract covering the same subject matter." *AFT*, 303 Mich App at 661.

Defendants advance three reasons why the trial court erred by implying a contract: (1) the BGS agreement was an express contract that covered compensation for plaintiff's provision of BGS services; (2) Exhibit A was a valid ASA; and (3) if the BGS agreement was invalid, then compensation for BGS services was covered in plaintiff's employment agreement, which defined plaintiff's compensation for "all services rendered" during the term of plaintiff's employment agreement.

Defendants first contend that plaintiff's signature on the ballot gave McKernan actual authority to negotiate the substantive terms of BGS services compensation. The language of the ballot belies this argument. The ballot can be construed to have authorized McKernan to negotiate the details of plaintiff's compensation. However, the ballot language cannot reasonably be construed to have authorized McKernan to sign plaintiff's employment agreement, including Exhibit A, or any anticipated contract for BGS services. Because the authority granted McKernan did not extend to signing employment agreements on behalf of the individual physicians, and plaintiff neither signed nor approved the BGS agreement, the trial court did not err by finding that there was no express written agreement covering plaintiff's BGS services.

Defendants also argue that the BGS agreement qualified as an ASA because the agreement was described in Exhibit A. This argument is also barred by the facts supporting the trial court's holdings.

As noted, in order to satisfy the definition of an ASA under § 2(a)(*i*), the agreement had to be described in Exhibit A or in a replacement or amendment signed by plaintiff and the president or CEO of BHM and approved by the BHM Operating Committee. In addition, Exhibit A or the replacement or amendment had to state the effective date of the agreement, as well as "the amount of the revenue received by [plaintiff] under the agreement or arrangement that is agreed to be 'ASA Income' . . . ." Exhibit A does not satisfy this, as it merely lists "General Surgical Services Panel," without describing any agreement for BGS services, and does not indicate the amount of revenue that plaintiff was to receive as ASA income. Although the description of BGS services and the amount of revenue plaintiff will receive is found in the BGS agreement, the BGS agreement does not meet the requirements of § 2(a)(*ii*) for a valid ASA because it was not signed by plaintiff and it did not state the effective date of the agreement.

According to defendants, if the BGS agreement is not a valid ASA, then plaintiff's compensation for BGS services is covered by the compensation provision in his employment agreement, which indicated that plaintiff will receive $432,102 "for all services rendered" during the term of his employment agreement. As the trial court pointed out, however, Exhibit A presented BGS services as an opportunity to earn ASA income in addition to the base compensation for plaintiff's normal duties, "notwithstanding any other provisions of this Exhibit or the attached Employment Agreement to the contrary . . . ." This language clearly indicates that compensation for BGS services was intended to be as an addition to plaintiff's $432,102 base salary. Further, defendants actually created a separate agreement for BGS services. Exhibit A's indication that BGS services provided an opportunity to earn additional ASA income, and the fact that defendants actually created the BGS agreement, indicates that, to some extent, both sides treated compensation for some BGS services as separate from plaintiff's employment agreement. In addition, Exhibit A listed Medical Director and Performance Improvement Committee Cochair as potential sources of ASA income, and separate written agreements were provided to plaintiff

for each of these services. Defendants' separate agreements with plaintiff for two of the services listed on Exhibit A, and McKernan's confirmation that a contract for call was in the works, further supported the court's finding that plaintiff's compensation for BGS services would also be treated in a separate agreement.

As Exhibit A did not meet the requirements in § 2(a)(*i*) for a valid ASA, and the BGS agreement did not meet the requirements in § 2(a)(*ii*) for a valid ASA, the trial court did not clearly err by concluding that neither plaintiff's employment agreement nor the BGS agreement barred plaintiff's quasi-contract claims.

Defendants next contend that if plaintiff's quasi-contract claims were not barred, then the trial court abused its discretion by not amending the judgment to set off from plaintiff's damages award the amount that defendants had already paid plaintiff out of the compensation pool for night and weekend call. "An appellate court reviews a trial court's ruling on a motion to amend judgment for an abuse of discretion." *Kern v Kern-Koskela*, 320 Mich App 212, 235-236; 905 NW2d 453 (2017). "An abuse of discretion occurs when the decision resulted in an outcome falling outside the range of principled outcomes." *Estate of Carlsen v Southwestern Mich Emergency Servs, PC*, 338 Mich App 678, 693; 980 NW2d 785 (2021) (quotation marks and citation omitted).

Returning the amount withheld from plaintiff's salary to fund the call pool was a remedy to the trial court's determination that defendants withheld $73,200 from plaintiff's compensation as part of its unilateral decision about how they would compensate plaintiff for providing BGS services. Returning the money without a set off was also consistent with defendants' treatment of other BGS services providers. For example, defendants contracted with two surgeons to provide BGS services in return for a base salary plus $73,200, without any obligation to pay into the call pool. Although a defense witness explained that the contracts for these surgeons were transitional contracts, the trial court, sitting as fact-finder, was free to assess the credibility and weight of her testimony. See *Guerrero v Smith*, 280 Mich App 647, 669; 761 NW2d 723 (2008). In addition, surgeons who stopped providing BGS services had $73,200 restored to their salaries, a move that McKernan testified was inconsistent with the concept of the call pool. Lastly, $322,911.32 is the amount of call pay that plaintiff earned under the rates set by defendants' BGS agreement; presumably, defendants believed that to be a fair amount.

In light of the foregoing, we cannot say that the trial court's decision not to set off $322,911.32 from plaintiff's damages award fell outside the range of principled outcomes. See *Carlsen Estate*, 338 Mich App at 693.

Finally, defendants argue that the trial court erred by concluding that they were not entitled to recover $240,500 that they mistakenly paid plaintiff for providing dayshift BGS services. We are not persuaded. The trial court's ruling regarding plaintiff's equitable claims provided the basis for the court's judgment of no cause of action on defendants' counterclaim. Defendants argue that the court erred as a matter of law because its claim to recover $240,500 was unrelated to whether the BGS agreement was valid and to whether plaintiff "was entitled to fair market value for night-shift BGS services." However, plaintiff is not seeking to recover fair market value for night-shift BGS services only; rather, he is seeking a fair market hourly rate for all 7,656 hours of BGS services that he provided, regardless of whether he provided them during the day, at night, or on

the weekends. The $240,500 represents the annual addition of $74,000 to plaintiff's salary for 3.25 years of dayshift BGS services. Whether defendants authorized the annual installments, and whether $240,500 properly compensated plaintiff for dayshift BGS services, are related to plaintiff's equitable claims.

Defendants alleged in their counterclaim that plaintiff's failure to return the $240,500 constituted a breach of contract because Exhibit A did not provide for $74,000 for dayshift BGS services. "A party asserting a breach of contract must establish by a preponderance of the evidence that (1) there was a contract (2) which the other party breached (3) thereby resulting in damages to the party claiming breach." *Miller-Davis Co v Ahrens Constr, Inc*, 495 Mich 161, 178; 848 NW2d 95 (2014). Establishing the second element required defendants to identify a duty of plaintiff and to allege specific facts to demonstrate that he breached that duty. However, defendants have not identified any specific duty in plaintiff's employment agreement that plaintiff is alleged to have breached. Defendants assert that plaintiff breached his employment contract because he did not return $240,500. This seems to imply that, because Exhibit A did not expressly address compensation for dayshift BGS services, plaintiff should have sua sponte returned the $74,000 factored into his base salary for those services. In other words, the basis of defendants' breach-of-contract claim is what plaintiff's employment contract did not say rather than what it said. Defendants cite no authority imposing such a duty or finding a breach of duty under such circumstances.

Defendants also allege that they were entitled to the return of the money under a theory of unjust enrichment. "Whether a specific party has been unjustly enriched is generally a question of fact . . . [but] whether a claim for unjust enrichment can be maintained is a question of law[.]" *Jackson v Southfield Neighborhood Revitalization Initiative*, ___ Mich App ___, ___; ___ NW3d ___ (2023) (Docket No. 361397); slip op at 27-28 (quotation marks and citation omitted; alterations in original). Unjust enrichment is a cause of action to correct a party's unjust retention of a benefit owed to another. *Wright v Genesee Co*, 504 Mich 410, 417; 934 NW2d 805 (2019). Unjust enrichment is grounded in the idea that a party "shall not be allowed to profit or enrich himself inequitably at another's expense." *McCreary v Shields*, 333 Mich 290, 294; 52 NW2d 853 (1952) (quotation marks and citation omitted). An unjust-enrichment claim can arise when a party "has and retains money or benefits which in justice and equity belong to another." *Id.* (quotation marks and citation omitted). Although the trial court did not elaborate its reasoning, the record supports that the court did not err by entering a judgment of no cause of action.

The trial court determined that defendants unilaterally decided how they would compensate plaintiff for BGS services and that plaintiff was not paid what he was owed. The trial court also heard from plaintiff, Dr. Borozan, and Dr. Isacksen that WRVU-based compensation was inadequate for daytime BGS services. Dr. Isacksen testified that he did not think that MGMA captured what was actually happening on the ground, and defense witness McKernan agreed that WRVUs alone could not fully compensate for BGS services because of the time commitment and presence requirement not reflected in WRVUs. These assessments of WRVU-based compensation were affirmed to some extent by defense witness Laurel Barber regarding how the CPT codes upon which WRVUs were based could be modified to account for the complexities of treating patients of BGS services and that CMS had begun to allow for "time based billing." Contrariwise, Jones maintained that compensation for BGS services was included in the surgeons' base pay, and he implied that MGMA's inclusion of data on the types of physicians who worked in Level 1 trauma

centers meant that MGMA captured what was happening on the ground. The trial court, sitting as the fact-finder, was free to assess the credibility and weight of this testimony. See *Guerrero*, 280 Mich App at 669. In light of the trial court's ruling and the testimony at trial, and given the trial court's role to assess the credibility of witnesses and the weight of their testimony, we conclude that the trial court did not err by entering a judgment of no cause of action on defendants' counterclaim. See *Mich Nat'l Bank & Trust Co v Morren*, 194 Mich App 407, 410; 487 NW2d 784 (1992).

## B. DOCKET NO. 366530

In the consolidated appeal, plaintiff contends that the trial court erred by not awarding him a fair market rate of $212.71 an hour for his 7,656 hours of BGS services. We review for clear error a trial court's determination of damages after a bench trial. *Marshall Lasser, PC v George*, 252 Mich App 104, 110; 651 NW2d 158 (2002). "Clear error exists where, after a review of the record, the reviewing court is left with a firm and definite conviction that a mistake has been made." *Id*.

When a trial court finds a contract implied in law, the party on whose behalf the contract is found may recover the reasonable value of services rendered under a theory of quantum meruit. See *Morris Pumps v Centerline Piping, Inc*, 273 Mich App 187, 194-202; 729 NW2d 898 (2007).

To establish a fair, hourly rate for providing BGS services, plaintiff presented evidence of the hourly rate that defendants paid Healthcare Midwest for BGS services before the 2013 acquisition, defendants' compensation agreements with surgeons other than plaintiff after 2013, and the compensation that defendants would have paid to plaintiff under a proposed 2018 contract. Plaintiff contends that this evidence showed that $212.71 an hour is a reasonable, fair market hourly rate, and that the trial court clearly erred by not awarding him $212.71 for his 7,656 hours of BGS services, minus the $181,648.88 of hourly compensation that defendants paid him.

That defendants paid Healthcare Midwest $212.71 for daytime BGS services before defendants' acquisition, and that defendants contracted with Dr. Minnick in 2014 to pay him $225 for BGS services, does not establish that the fair hourly rate for plaintiff's BGS services was $212.71. The surgeons compensated under these two contracts were not similarly situated to plaintiff, as plaintiff was an employee of defendants who received a guaranteed salary, and the Healthcare Midwest surgeons and Dr. Minnick were outside surgeons engaged under short-term agreements to fill an urgent need. There is no evidence that they received guaranteed salaries, calculated in part on the basis of WRVUs earned for providing BGS services, or fringe benefits.

Plaintiff implies that his salary is not relevant because BGS services were "essentially a second job." In addressing this issue, the court stated that BGS services were "clearly outside" of plaintiff's employment agreement and that the parties "understood these services to be separate." The court also noted that the parties understood that plaintiff's "overall compensation would include a base salary with some accommodation for [BGS services]." However, the court made these comments in the context of its discussion whether the parties had a valid written agreement for compensation for BGS services. When it came to the mechanics of BGS services, the trial court focused primarily on how the call pool functioned, including testimony that providing BGS services was tantamount to a "second job." But the court's finding that $181,468.88 was fair

market value for plaintiff's BGS services, implied the rejection of plaintiff's claim of $212.71 for 7,656 hours spent providing BGS services.[1]

For these reasons, the trial court did not err in finding that plaintiff did not establish that $212.71 is a reasonable hourly rate for BGS services. The evidence of hourly compensation for BGS services applied either to short-term arrangements with outside physicians to meet an immediate need or to different models of care and compensation. Plaintiff has not established that the trial court clearly erred by determining that $181,468.88 provided fair market value for plaintiff's provision of BGS services.

Plaintiff also contends that the trial court erred by ordering defendants to reimburse $409,920 withheld from his salary to fund the call pool, as opposed to a slightly higher amount. According to plaintiff, although the trial court stated that plaintiff worked under the employment agreement for 5.6 years, the record established that he worked under the employment agreement for 5.67 years. Therefore, the trial court should have ordered defendants to reimburse plaintiff $415,044. We agree. Dr. Isacksen testified that the initial employment agreement was extended a number of times because plaintiff would not sign a new contract, and plaintiff's employment ended on February 28, 2019. Accordingly, the evidence supports that plaintiff was employed under the original employment agreement for 5.67 years. Therefore, the trial court clearly erred when it determined that plaintiff operated under the employment agreement for only 5.6 years. To the extent that the trial court meant to order defendants to reimburse plaintiff all the money they withheld from his compensation under the original employment agreement, the record supports that that amount should have been $415,044.

---

[1] Plaintiff also submitted evidence of defendants' 2015 contract with Dr. Minnick and their 2016 contract with Dr. Sarah Larson, as well as both physicians' 2018 contracts. None of these contracts establish that $212.71 (or $213.41) was a fair hourly rate for plaintiff's BGS services. Under these contracts, defendants paid the surgeons a base salary plus $73,200 for BGS services and did not require them to contribute to the call pool. By restoring the $73,200 that had been deducted from plaintiff's pay to fund the call pool, the trial court put plaintiff in a similar position to Drs. Minnick and Larson. Although the trial court admitted these contracts into evidence, the court stated that it would not view the hourly rates reflected in these contracts as something that should have applied to plaintiff from 2013 to 2018. The court reasoned that the hourly rate was decided in the context of new negotiations and was not relevant to the hourly rate paid as the result of past negotiations. In addition, these contracts reflected a shift in defendants' approach to acute-care services and a move toward a "surgicalist" model of care. Although plaintiff disputed this explanation, the trial court, sitting as the fact-finder, was free to assess the credibility and weight of these testimonies. See *Guerrero*, 280 Mich App at 669.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Brock A. Swartzle
/s/ Kirsten Frank Kelly
/s/ Christopher M. Murray